575 So.2d 534 (1990)
Mary D. GREGORY d/b/a Gregory's St. Andrews Country Club
v.
The CONTINENTAL INSURANCE COMPANY, James R. Biddix d/b/a Jim Biddix INS. & Property Management & Jim Biddix Realty & Ins. Agency, Inc.
No. 07-CA-59256.
Supreme Court of Mississippi.
December 27, 1990.
Rehearing Denied February 13, 1991.
John L. Hunter, David O. McCormick, Cumbest Cumbest Hunter & McCormick, Pascagoula, for appellant.
William M. Rainey, Fredrick B. Feeney, II, Franke Rainey & Salloum, Gulfport, for appellee.
En Banc.
HAWKINS, Presiding Justice, for the Court:
Mary D. Gregory, doing business as Gregory's St. Andrews Country Club, appeals from a judgment upon a directed verdict in favor of The Continental Insurance Company in the circuit court of Jackson County on the issue of punitive damages for failure of Continental to pay a business interruption loss claim. We find that the circuit judge correctly ruled that no punitive damage question arose from Continental's conduct prior to suit being filed. On the other hand, as set forth in our opinion, sufficient evidence was adduced to require Continental to offer a justification for not paying the claim for over a year after suit was filed. The judgment *535 based upon a directed verdict being premature, we reverse and remand for determination of this issue.

FACTS
Willard Chuck Gregory, a banker and businessman, in October, 1984, acquired for his wife Mary D. (Lisa) Gregory a leasehold interest in the St. Andrews Country Club, a commercial golf course in Jackson County. The lessor owner at the time was James R. Biddix, a local realtor and businessman, who was also a licensed insurance agent and managed realty investments. Although the lease was in Mrs. Gregory's name, total management of the business was assumed by Mr. Gregory. Mrs. Sharon Buck, who had been the bookkeeper for St. Andrews for over ten years, continued as bookkeeper for the Gregorys.
In addition to the golf course, St. Andrews had the following facilities:
1. A building housing the business office, a pro shop, and a small restaurant selling mostly sandwiches and beverages.
2. A maintenance building housing tractor and mowers, seed and also used for storage.
3. A swimming pool, and a bath house.
On March 15, 1985, The Continental Insurance Company (Continental) issued Mrs. Gregory Special Multi-Peril Policy number 1 70 44 25 covering St. Andrews, in which Mr. Biddix by endorsement was named as an additional insured. The policy was issued through Continental's local agency, Stewart-Sneed-Hewes, Inc., of Gulfport. All the buildings were covered by hazard insurance. The office, pro shop, and restaurant building were listed as location number 1 and named building number 1 in the policy. All buildings were insured for their full damage or replacement costs, less a deductible. There was also coverage of the personal property contents. The Supplemental Declarations Endorsement described this building as follows:

 Loc. Bldg. DESIGNATED PREMISES OCCUPANCY
 No. No.
 1 1 W/A Bell Fountain Pro-Shop Bldg.
 Road & Tenellion Restaurant Cnts.
 Drive, Ocean Springs, Office
 Ms.

This endorsement also listed the co-insurance percentage applicable and limits of liability, of no moment to our decision.
In addition to the hazard insurance on building 1 and its contents, Continental also issued a Gross Earnings Endorsement. Its heading gave the location of the premises as location 1 and building 1. The policy under this endorsement provided:
1. Subject to all the provisions applicable to Section 1 of this policy, except the Coinsurance Clause and the Deductible Clause, this policy is extended to insure against loss resulting directly from necessary interruption of business caused by the perils insured against damaging or destroying, during the policy period, real or personal property (except finished stock) at the premises described in this endorsement, subject to the limit of liability specified above for the premises at which the damage or destruction occurs. For the purposes of this insurance, "perils and insured against" shall mean the perils, as defined and limited in the forms and endorsements listed above, for each premises specified and also subject to the provisions of this endorsement. (Emphasis added)
2. The Company shall be liable for:
a. the actual loss sustained by the insured resulting directly from necessary interruption of business, but not exceeding the reduction in gross earnings less charges and expenses which *536 do not necessarily continue during the interruption of business, for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property herein described as has been damaged or destroyed commencing with the date of such damage or destruction and not limited by the date of expiration of this policy. Due consideration shall be given to the continuation of normal charges and expenses, including payroll expense, to the extent necessary to resume operations of the insured with the same quality of service which existed immediately preceding the loss; and
b. the actual loss sustained by the insured, resulting directly from an interruption of business as covered hereunder, during the length of time, not exceeding two consecutive weeks, when, as a direct result of damage to or destruction of property adjacent to the premises herein described by the peril(s) insured against, access to such described premises is specifically prohibited by order of civil authority; and ...
This endorsement also contained the following requirement of the insured in event of loss:
8. Requirements in Case Loss Occurs: The insured shall give immediate written notice to the Company of any business interruption loss as covered by this policy and protect the property from further damage that might result in extensions of the period of interruption; and within 60 days following the date of damage to or destruction of the real or personal property described, unless such time is extended in writing by the Company, the insured shall render to the Company a proof of loss, signed and sworn to by the insured, stating the knowledge and belief of the insured as to the following:
a. the time and origin of the property damage or destruction causing the interruption of business,
b. the interest of the insured and of all others in the business,
c. all other contracts of insurance, whether valid or not, covering any manner the loss insured against by this policy,
d. any changes in the title, nature, location, encumbrance or possession of said business since the issuing of this policy, and
e. by whom and for what purpose any building herein described and the several parts thereof were occupied at the time of damage or destruction, (Emphasis added)
and shall furnish a copy of all the descriptions and schedules in all policies, and the actual amount of business interruption value and loss claimed, accompanied by detailed exhibits of all values, costs and estimates upon which such amounts are based.
The insured, as often as may be reasonably required, shall exhibit to any person designated by the Company all that remains of any property herein described, and submit to examinations under oath by any person named by the Company, and subscribe the same; and, as often as may be reasonably required, shall produce for examination all books of account, bills, invoices and other vouchers, or certified copies thereof if originals be lost, at such reasonable time and place as may be designated by the Company or its representative, and shall permit extracts and copies thereof to be made.
On September 2, 1985, Hurricane Elena struck the Gulf Coast causing several hundred trees to be blown over on the golf course. The maintenance building was destroyed; there was also damage done to building 1 and the swimming pool. The golf course was closed for approximately fourteen days to clear the trees and debris off the course.
Over in that month Richard J. Kuzmanoff, representing the Underwriters Adjustment Company, which in turn represented Continental, went to St. Andrews to inspect the Gregorys and Biddix's loss. There was no disagreement as to the hazard *537 loss, all claims as to this being thereafter paid by Continental. While he was there, however, Mr. Gregory asked about being paid for his business interruption loss. Kuzmanoff replied that there was no business interruption insurance for trees on the golf course. According to Mr. Gregory he offered a nominal sum of $200.
The Gregorys were of the view they were entitled for the golf course being shut down and on October 1 contacted an attorney, Mr. Joe Colingo. Colingo telephoned Dick Herman, manager of Stewart-Sneed-Hewes, advising him that Continental owed the Gregorys for this business interruption. Kuzmanoff was placed on the 'phone and told Colingo the policy did not cover destruction of trees.
Colingo told him the Gregorys were not asking to be paid for loss of the trees, but for interruption of the business they would have derived from use of the golf course. Colingo also told Kuzmanoff Gregory had furnished him a list of his gross earnings, and had shown him the policy. Herman came by and looked at the documents.
According to Colingo, in one of his telephone conversations, he told Kuzmanoff that the Gregorys' golf course had been closed down fourteen days, and they were entitled to $1,800 a day for this period. It was Colingo's interpretation of the policy that since a hurricane was a peril insured against, the Gregorys were entitled to be paid for business interruption insurance on the golf course being closed. Colingo testified that in another conversation Kuzmanoff told him the Gregorys' claim might be worth $750 to $1,000, and he relayed this information to Mr. Gregory.
Colingo's law firm primarily represents insurance companies, and he was told a few days later that his firm was representing Continental on another claim. Colingo considered there might be a conflict and withdrew from counseling the Gregorys.
The Gregorys at some subsequent date employed David O. McCormick and John L. Hunter of the law firm Cumbest, Cumbest and Hunter in Pascagoula. This law firm did not write Continental or the local agency Stewart-Sneed-Hewes, or contact them in any way making a demand for payment under the policy. On April 7, 1986, Mrs. Gregory, doing business as Gregory's St. Andrews Country Club, filed a complaint in the Jackson County Circuit Court against Continental and Biddix for $25,200 actual damages, $250,000 compensatory damages and $7,000,000 in punitive damages.
Exhibit 2 introduced at trial contains a copy of a letter from Kuzmanoff to Mrs. Gregory dated April 25, 1986. Pertinent portions of the letter state:
During conversations with Mr. Colingo relating to the business interruption portion of this claim references were made to financial statements and supporting papers demonstrating your calculated business interruption loss. We discussed the language of your policy and how it related to the calculation of your business interruption loss. Our position remains that should you be able to demonstrate a loss of income relating to the restaurant and bar operation we would entertain acceptance of that portion of the claim.
The next paragraph calls attention to the above quoted policy required duties of the insured in such a claim, and then sets them out. Following this the letter continues:
Based on these terms, and on behalf of Continental Company, I hereby demand that you submit to me, as representative of the Company, sworn statement(s) of loss, relating to the captioned claim, within 60 days of receipt of this letter. A blank copy of an acceptable form of statement of loss is enclosed for your use or reference.
On June 26, 1986, Continental answered. Under its fifth defense, it pled:
That the requirements, prerequisites and obligations of the Plaintiff under any policy of insurance in effect between this Defendant and the Plaintiff have not been met by the Plaintiff.
There was extensive discovery by both sides preparatory to trial, and on October 12, 1987, William M. Rainey, counsel for Continental, hand delivered to Hunter a letter enclosing a check in the amount of *538 $1,075.37 payable to Mrs. Gregory d/b/a St. Andrews Country Club, which stated it represented "benefits for her loss under the Gross Earnings Endorsement of Policy No. 1 70 44 25 sustained following September 2, 1985." It concluded:
This payment is made without prejudice to any additional claims your client may have or assert. Similarly, payment is made without prejudice to all rights and defenses which Continental Company may have.
Trial began October 14. Mrs. Gregory called J.P. Turner as an adverse witness. Turner was claims manager, or general adjuster, in Atlanta for Underwriters Adjustment Company, a subsidiary of Continental Insurance. He testified that it was his responsibility to determine whether the claim should be paid, but the amount was to be calculated by Kuzmanoff, and that the $1,075.37 represented all for which the company was liable, which was the entire loss of the Gregorys reduced by a co-insurance factor built into the policy. According to him, when suit was filed and the claim brought to his attention, it contained no financial records of St. Andrews, and that the business interruption loss could not be calculated without financial data. He further testified that it was in the fall of 1986 before Continental began receiving any financial data as to the loss, and some of it was received as late as September, 1987. He said they never had denied the claim, but rather their position had been since the beginning that, upon receipt of proper information in order to calculate the company's exposure under the gross earnings endorsement, that they could then calculate the loss and offer to pay that amount to the insured. He repeated that it was only after suit was filed that Continental began receiving any written financial information, and this extended over a period until shortly before trial.
The following witnesses also testified for Mrs. Gregory: Mr. Gregory, Kuzmanoff as an adverse witness, Mrs. Buck, and as noted, Colingo.
Continental did not examine Kuzmanoff following his testimony as an adverse witness, apparently reserving that for his appearance as a witness for the defense. Mrs. Buck testified that from the golf course being shut down fourteen days, she computed a gross earnings loss of $21,252, from which she deducted $629 which would have been operating expenses had the course been open those days, leaving a net of $20,632. On cross-examination she said that gross earnings were the same as gross sales the golf course would have received had it remained open.
When Mrs. Gregory rested the circuit judge sustained Continental's motion for a directed verdict as to punitive damages.[1] We quote at some length from the court's ruling:
BY THE COURT:
All right, I'll sustain the motion as to punitive damages. There are arguable reasons; everybody, the attorneys and everybody else, had argued this for two days or three days now. And there are other reasons, without the Court going into detail, that punitive damages simply are not applicable in this case in the opinion of this Court. However, at the outset the Defendant, Continental Insurance Company, has admitted that there was business interruption insurance and that there was some interruption and they owed something. To that extent, the Court will enter a directed verdict in favor of the Plaintiff as to business interruption coverage.
There are certain things that confused  I wouldn't say confused, but concerned the Court during this trial. One is the callous disregard of the requirement for written notice, that it shouldn't be required. I just can't imagine attorneys looking at an insurance policy, reading it and saying that written notice of the claim is required *539 and that they didn't have to do it. But the insurance company did not advance that as a cause; they have gone through this thing, and so, as far as the Court is concerned, that's not a material issue and it has been waived. And as I said, I am going to enter a judgment in favor of the Plaintiff as to the interruption.
Now, the question is how it should be calculated. The Court finds that, looking at the insurance policy, there is little question that the premises insured are described in the policy of insurance on the preface page of the policy, location 1 and building 1 is described as a pro shop and a restaurant, office. On the business interruption endorsement, it is clear that the premises covered on that endorsement is limited to the location 1 and building 1, which is the restaurant and pro shop office. A reading of that endorsement clearly says that it shall be a loss due to the premises insured, premises described in the endorsement, which 1, 1, or the restaurant and the pro shop. Therefore, in order to recover under the business interruption, the loss must be attributable to those insured premises. The insurance company has correctly interpreted that part of the policy. However, the Court further finds the insurance company has not correctly interpreted whether cart fees and other incidentals are available. If those fees were not available to the Plaintiff in part, or due to damage to the restaurant and pro shop, then they are recoverable under the business interruption for whatever period the pro shop and restaurant building was out of operation due to damage of that building.
There has been some argument about reduction. Of course, insurance was never intended to give a windfall for not paying sales tax, for not taking into consideration the cost of merchandise that is sold. The policy clearly says that those expenses that are not continuing shall be deducted. That means the cost of merchandise, sales tax. The continuing expenses, such as labor, salaries, or wages, power bills, anything that is continuing, should not be deducted. Most of the argument between counsel and the parties hereto has been around what should be included and should not be included. If there was sufficient evidence before this Court that the Court could determine from the testimony what the figure would be or should be, maybe I could  I would try, but the only way I could try it would be to sit down with the balance sheets that are there. I don't know that I could do it. I don't know that the jury can do it, whether there's sufficient evidence to do it. But I'll hear from the attorneys on that point when I get through. But it should be a mathematical computation at this point, based on the financial records of the corporation as to what the figure should be.
The company has admitted by  and I say admitted  by and through their adjuster that there were eleven days that he determined that the  there was certain damage that they were entitled to, and the only way that can be interpreted, since he did say that it was limited to the building, that they admit eleven days down. Plaintiff has said fourteen; not a whole lot of difference on that point.
Admittedly, the Plaintiff, to some degree, was relying on the golf course being open to play, and as I have already said, that's not what the policy said. I know fishing camps would love to have insurance companies issue policies that they can get closed down when it rains and the wind blows and the waves are high and a golf course would love to be able to get insurance that they get paid when it rains for forty days and forty nights or if it's too muddy for the golf carts to go out. But I know of no insurance policy, even Lloyd's of London. But be that as it may, I'm not taking judicial notice of that fact; that's just something I haven't heard. And it would be awfully *540 difficult to find it, in the Court's opinion, for whatever that's worth... . And if anything this lawsuit has shown, it is that business coverage on a golf course isn't worth a whole lot, because if a golf course can be played, people will be out there.
But the pro shop being down is not worth a whole lot, because the damage provisions of the policy are going to pay for the damage, loss of merchandise and so forth, and if it does and it's not destroyed, then the office is inoperable. You can run a trailer in there and open up a temporary office and operate. And that's, in fact, what the policy requires them to do. So, it's not worth a whole lot, and Mr. Biddix did advise Mr. Gregory of that. Mr. Gregory consulted with his attorney and they both were at least to some degree aware, by their own admissions, that there was a tremendous limitation of the value of this type of insurance to them.
Following this, Mrs. Gregory and Continental agreed that in view of the court's ruling, they would stipulate that if the jury were so instructed it would return a verdict of $9,000 against Continental and judgment could be entered for that amount. This would be without prejudice, however, for either party to urge whatever they desired in a motion for new trial or on appeal. Following this, the court on November 1, 1987, entered judgment in favor of Mrs. Gregory against Continental for $9,000 with legal interest from date of judgment.
Mrs. Gregory has appealed.

LAW
At the outset it should be noted that a business interruption claim is not as simple to compute as physical damage or destruction.[2] It was apparently Colingo's position that Continental was liable for all loss of business earnings attributable to the entire golf course being shut down, and the Gregorys were not restricted to whatever business loss was suffered from the restaurant and pro shop being damaged. We agree with the circuit judge that the business interruption loss did not cover loss from the entire golf course being shut down, but rather to whatever business loss they suffered resulting from damage to building number 1. Continental not having cross-appealed, it is bound by a judgment in the amount of $9,000 for this loss.
Even if we disagreed with the circuit judge, there was manifestly an arguable reason under the terms of the policy not to pay Mrs. Gregory business interruption earnings loss from the entire golf course being shut down.
On the issue of punitive damages, the first question facing us is that manifestly Mrs. Gregory was entitled to some payment under the business interruption endorsement, so why did Continental not pay it?
The answer to this is that under the terms of the policy, by contract Continental was not obligated to pay Mrs. Gregory any sum until written proof of loss was filed. And surely, an insurance carrier should not be asked to write a check on a claim of this uncertainty in amount until it had some documentation. Harris v. American Motorist Ins. Co., 240 Miss. 262, 126 So.2d 870 (1961).
There obviously was an oral misunderstanding between the parties from the beginning, the Gregorys and Colingo thinking they were entitled to coverage from the entire golf course being closed because of the trees and debris on the grounds, and Kuzmanoff telling them Continental was not liable for this.
Nevertheless, Continental was never required under its insurance contract to make any payment unless and until the proof of loss provisions under this endorsement were satisfied. Kuzmanoff apparently thought from whatever the Gregorys and Colingo had told him verbally and what he had observed from being on the property, *541 that the claim might be worth $750 to $1,000 and so stated to Colingo. The Gregorys rejected this.
No proof of loss was filed. No written documentation was ever filed; no written demand was ever made on Continental before suit was filed. Counsel's explanation of this in oral argument was that they were not required to do so, since Continental had denied the claim. That simply will not wash. In the first place, the claim itself was never denied by Kuzmanoff, either to Mr. Gregory or to Colingo. He denied owing them for business interruption caused by the trees and debris obstructing the golf course. Furthermore, under the terms of the policy, unless or until Mrs. Gregory filed some written documentation of loss of income caused by the pro shop and restaurant being closed down, Continental was not obligated to do anything. We can hardly attribute the Gregorys' failure to an inability to do so. Mr. Gregory was a businessman and had been president of two different banks, and St. Andrews had a bookkeeper who should have been able to furnish Continental some information from its business records. This Court shares the view of the circuit judge that there was a callous disregard of the written notice requirement by Mrs. Gregory's counsel. It would have to be under much more unusual circumstances than this case for this Court to entertain a punitive damage claim for the insurance carrier's failure to pay when the insured never even bothered to file any proof of loss, or make a written demand upon the insurance carrier before filing suit.
We agree with the circuit judge that there was nothing about the facts prior to suit being filed which justified submitting a punitive damage issue to the jury. Unfortunately for Continental, the inquiry does not end with the filing of the complaint against Continental.

CONDUCT AFTER SUIT FILED
As noted, the record contains a copy of a letter from Kuzmanoff to Mrs. Gregory, dated April 25, 1986. This letter unequivocally and clearly sets forth Continental's position as to Mrs. Gregory's claim. It would constitute a complete defense to any punitive damage claim because Mrs. Gregory never complied with it. We had assumed from reading the record that Mrs. Gregory received the letter, it apparently having been mailed certified mail. When the Court queried both counsel during oral argument about this letter, however, we were told that in fact Mrs. Gregory never received this letter, and there was even an insinuation the original was never mailed.
The circuit judge was likewise puzzled with the defense counsel's never raising in his defense before the court that Mrs. Gregory had failed to comply with the policy. He held this requirement had been waived, and there has been no cross-appeal from this ruling.
The circuit judge never considered Continental's conduct following filing of the complaint, and here we find he erred. An insurance carrier's duty to promptly pay a legitimate claim does not end because a lawsuit has been filed against it for nonpayment. Put more bluntly, if you owe a debt the duty to pay does not end when you are sued for nonpayment of it.
When suit was filed the plaintiff should have been informed by Continental, in a manner from which there could be no misunderstanding, that it recognized a sum in some amount was owed from business interruption caused by the damage to building number 1, and Continental was willing to pay whatever was due for this loss. Yet in order to do so, it was necessary that the plaintiff furnish it written documentation of this loss. Continental should either have done this by communication to Mrs. Gregory's counsel, or else specifically raised plaintiff's failure to comply with the policy in its pleading, and call the matter to the attention of the court for a ruling. There was no occasion to be coy on this policy provision.
Because Continental did not insist upon this obvious right which it had under the policy to receive documentation of the loss as a condition precedent to paying anything, but  as the circuit judge ruled  *542 waived it, the question arises why it did not pay the claim? Suit was filed April 7, 1986. No payment was tendered until September 12, 1987, two days before trial. We are left to wonder why the delay?
The circuit judge did not address this question when he dismissed Mrs. Gregory's action when she rested her case in chief. We find that Continental owes some explanation for failure to pay the claim after the complaint was filed, and should have been required to go forward on its proof giving some legitimate or arguable reason for the delay. If the circuit judge finds its reasoning insufficient, he should submit the issue of punitive damages for Continental's conduct after suit was filed to the jury.
There is another factor. Continental stipulated that a jury would award a $9,000 judgment against it on contractual damages. Continental has not cross-appealed from the amount of this judgment. Yet just before trial it only tendered $1,075.37. This likewise requires explanation for the disparity.
We therefore remand this cause for determination of the reasonableness of or arguable reason for Continental's conduct after suit was filed.
We find no occasion for censure against Continental prior to the institution of this suit. We take judicial notice that Hurricane Elena was a disaster to that particular area of our Gulf Coast. No doubt hundreds of claims running in the millions of dollars were filed. Insurance carriers were burdened with the task of investigating and paying claims as promptly as possible to relieve the great financial hardship inflicted upon a host of Gulf Coast insureds. In this case Continental promptly paid all hazard claims of the Gregorys and Mr. Biddix. The amount due from loss of business to a sandwich shop and pro shop for 11-14 days could not have been a comparatively large claim, or susceptible to easy and certain proof, and Continental was clearly entitled to documentation in a written proof of loss before it was obligated to pay under any such claim. When suit was filed the emergency was long since over and the situation entirely different.
We accordingly reverse and remand for proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED AND REMANDED IN PART FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON, PITTMAN and BLASS, JJ., concur.

APPENDIX A
J. HAWKINS: Mr. McCormick, let me tell you some things that are bothering me about this case on punitive damages. I want to give you an opportunity to address them. Number One, I would like you to tell me, uh, if Mr. Kuzmanoff had come there  am I pronouncing his name right?
McCORMICK: As I understand the pronunciation, yes, sir.
J. HAWKINS: When he came around there in the latter of September or October the 1  the hurricane was on September 1, wasn't it? September 1 and 2?
McCORMICK: Correct, Your Honor.
J. HAWKINS: When he came around there on October the 1st, ... You tell me what he owed your client. What the company owed your client October the 1st if he had just written out a check  give me the figures.
McCORMICK: I don't believe you can give a figure. I think that's part and parcel of the basis of the bad faith claim is that the 
J. HAWKINS: Have you figured it out yet?
McCORMICK: It's, uh, 
J. HAWKINS: You've had it two or three years. What did he owe him?
McCORMICK: All right. That goes into a mathematical calculation dealing with  you also have a  a 50% co-insurance clause 
J. HAWKINS: You are unable today to give me a dollars and cents figures as what was owed on that day?
*543 McCORMICK: That's correct and I think they gave them a 169-page booklet and I'm not sure he can completely compute it.
NOTES
[1] Mrs. Gregory's suit against Biddix was also settled following plaintiff's resting, and has no bearing on this appeal.
[2] A colloquy between a Justice on the panel and counsel for plaintiff in oral argument is attached as an appendix.