Argued and submitted September 15, 1998, reversed and remanded
December 15, 1999, petition for review denied May 3, 2000 (330 Or 331)

## PROTECTION MUTUAL INSURANCE CO.,
an Illinois corporation,
*Appellant,*

*v.*

## MITSUBISHI SILICON
## AMERICA CORPORATION,
*Respondent.*

(96C13332; CA A98943)

992 P2d 479

I. Franklin Hunsaker argued the cause for appellant. With him on the briefs were Douglas G. Houser and Bullivant Houser Bailey.

James T. McDermott argued the cause for respondent. With him on the brief was Ball Janik LLP.

Before De Muniz, Presiding Judge, and Haselton and Linder, Judges.

LINDER, J.

## LINDER, J.

This case arises out of an insurance coverage dispute between plaintiff Protection Mutual Insurance Company (Protection Mutual) and defendant Mitsubishi Silicon America Corporation (known as and referred to in this opinion as Siltec). The specific issue is whether Siltec's general property casualty policy, issued by Protection Mutual, covers certain "business interruption" losses that Siltec incurred when it lost useable water and water discharge services due to a flood. Protection Mutual filed a complaint seeking a declaration that the policy does not cover the losses. Siltec counterclaimed for coverage on breach of contract, negligent misrepresentation, and estoppel theories. Protection Mutual moved for summary judgment on its declaratory judgment claim, and Siltec cross-moved for summary judgment solely on its breach of contract claim. After ruling that the policy provides the disputed coverage, the trial court granted Siltec's motion for summary judgment, denied Protection Mutual's motion, and did not reach Siltec's counterclaims for negligent misrepresentation and estoppel. On appeal, we hold that the policy does not cover the losses in question. We therefore reverse the summary judgment for Siltec and remand for entry of summary judgment in Protection Mutual's favor and for further proceedings on Siltec's counterclaims.

■     The facts pertinent to our review are not disputed.[1] Siltec operates a silicon wafer manufacturing plant in Salem, Oregon. In February 1996, the Salem area experienced a severe flood. On February 7, responding to increased turbidity in its water, the City of Salem (Salem) shut down its water treatment facility and requested that Siltec voluntarily reduce its water consumption. Siltec stopped all discretionary water uses, but it continued its nondiscretionary uses, which required Siltec to specially filter the incoming water to prevent dirt particles from damaging its equipment. On February 8, Salem closed its wastewater treatment facility

---

[1] Because the facts are not in dispute, we review the rulings on the cross-motions for summary judgment to determine whether either party is entitled to judgment as a matter of law. *See Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997); *Cochran v. Connell*, 53 Or App 933, 939, 632 P2d 1385, *rev den* 292 Or 109 (1981).

because of the threat of imminent flooding at its plant. As a result, Siltec could not discharge its wastewater into the sewer system. Because the space in its waste storage tanks was limited, Siltec was forced to cease most of its operations. Two days later, Salem restored sewer services, and Siltec was able to resume discharging wastewater. The incoming water from Salem's water treatment facility still lacked its usual clarity, however, so Siltec began buying clean water from an alternate source. Siltec used that supply until Salem's water was restored to normal.

Siltec incurred a loss of business revenue due to the limitations on its ability to conduct its operations. It also sustained increased operating expenses due to added costs for filtering water, performing equipment repairs, and purchasing clean water from the alternate source. Siltec sought coverage for those losses under its general property damage insurance policy with Protection Mutual. Protection Mutual denied coverage, and this litigation followed.

The particular type of coverage in dispute is often termed "business interruption" insurance. By way of background, it is helpful to understand the general nature of that coverage. Commercial property casualty policies, in their most basic form, insure against the risk of damage to or loss of a business's real and personal property. When real and personal property is lost or damaged, commercial enterprises often incur further consequential economic losses (*e.g.*, increased costs, lost profits) flowing from their inability, or impaired ability, to conduct their business operations. Special additional coverage, in the form of endorsements to a casualty policy, can be negotiated to cover those economic damages. In covering those consequential economic damages, so-called "business interruption" insurance is "designed to do for the business what the business would have done for itself had no loss occurred." *A & S Corporation v. Centennial Insurance Company*, 242 F Supp 584, 589 (ND Ill 1965). Typically the added endorsement is closely tied to the underlying property damage coverage. That is, the endorsement usually covers business interruptions that result from physical loss

or damage to covered property from a covered peril. *See generally* B. Glenn, Annotation, *Business Interruption Insurance*, 83 ALR2d 885 (1962). Few generalizations about business interruption endorsements can be made, however, because the nature of the coverage varies widely. In any given case, the particular terms and conditions of the policy in question must be examined to determine whether a specific business interruption loss falls within the scope of the coverage. *See generally id.* at 891.

■■ The interpretation of an insurance policy is a question of law. *Hoffman Construction Co. v. Fred S. James & Co.*, 313 Or 464, 469, 836 P2d 703 (1992). To determine an insurance policy's meaning, Oregon courts use a familiar and settled methodology, the goal of which is to ascertain the intent of the parties, based on the terms and conditions of the policy. *Id.*; *Totten v. New York Life Ins. Co.*, 298 Or 765, 770, 696 P2d 1082 (1985). The analysis begins with an examination of the plain meaning of the policy's terms, turns next to the context in which those terms appear, and, as a last resort resolves ambiguity by applying the rule of interpretation against the drafter of the language. *Hoffman*, 313 Or at 469-70.

In this particular case, the parties' dispute over the scope of the policy's coverage is not a result of different meanings that they attribute to a particular word, term, or phrase. Rather, the crux of their disagreement lies in the interplay between the policy's provisions and how the policy should be understood as a whole. The policy's overall design is typical of many insurance policies, especially those negotiated for complex business coverage, in which the nature and scope of the coverage is determined by a general statement of coverage that is modified, limited, and expanded by other provisions. *See generally Denton v. International Health & Life*, 270 Or 444, 450, 528 P2d 546 (1974) ("all parts and clauses [of an insurance contract] must be construed to determine if and how far one clause is modified, limited or controlled by others"). Thus, our essential interpretative task in this case turns less on the meaning of the individual parts or specific words and more on the meaning of the parts combined. *See generally Fisher v. California Insurance Co.*, 236 Or 376, 380,

388 P2d 441 (1964) ("Contracts, including insurance contracts, are to be construed as a whole, not as a congeries of separate parts.").

Before examining the combined meaning of the particular policy provisions at issue, it is helpful to be precise about Siltec's losses and, hence, the nature of the coverage that Siltec and Protection Mutual dispute. Siltec suffered two distinct types of losses: (1) lost business income due to interruption of the water and sewer services; and (2) extra expenses incurred due to quality problems with Salem's water supply (*e.g.*, filter replacements, equipment repair, and an alternative supply source). Both losses were consequences of the 1996 flood. Significantly, however, neither loss occurred because Siltec's property was itself flooded or directly damaged by flood waters. Rather, the losses were indirect consequences of flooding at the site of Salem's water supply and waste treatment facilities.

■        That distinction lies at the heart of the parties' disagreement about the policy's interpretation. Ultimately, the parties agree that the policy, through a special endorsement, covers some business interruption losses. They also agree that the policy covers some economic losses due to interruption of utility services. Finally, the parties agree that the policy covers some flood-related losses. They disagree, however, whether those endorsements, in combination, cover business interruption losses caused by loss of or impaired delivery of utility service due to flooding at the utility site.

With the focus of the dispute sharpened, we turn to an examination of the insurance policy in question. Overall, it is a general property casualty policy that indemnifies Siltec for damage and loss to its real and personal property. In what might be considered a declaration of its "base" coverage, the policy provides that Siltec is insured "against all risks of physical loss or damage" to its property, except as specifically excluded. A "general coverage clause" then incorporates "Property Damage Form 3000" and explicitly declares that any coverage beyond what that form provides must be provided by separate endorsements.

Form 3000, therefore, is the beginning point for determining the scope of the coverage provided by the policy.

It first describes the property insured (generally, most of Siltec's real and personal property) and the property excluded (such things as valuable papers, fine art, vehicles, property in transit, etc.). Then, and of significance here, the policy specifies certain sources of damage or loss (*i.e.*, perils) that are not insured against. In a section labeled "C. Exclusions," the policy divides excluded perils into two groups. "Group A" contains two exclusions relevant to this case:

"This Policy does not insure against loss or damage caused by or resulting from any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss:

"\* \* \* \* \*

"5.    lack of incoming electricity, fuel, water, gas, steam or refrigerant caused by an occurrence off the locations described in this Policy unless specifically endorsed herein; however, if the lack of such a service causes physical damage otherwise insured under this Policy on the described locations, this Policy shall cover such resulting damage;

"6.    flood waters, waves, tide or tidal water, the release of water, the rising, overflowing or breaking of boundaries of natural or man-made bodies of water, or the spray from any of the foregoing \* \* \*."

"Group B" contains one provision that is relevant, stating that the "[p]olicy does not insure against":

"6.    contamination including but not limited to pollution; shrinkage or change in color, flavor, texture or finish; all unless such damage directly results from other physical damage not excluded by this Policy."

If the policy contained no further provisions—that is, if there were no endorsements—then the issue before us would be readily resolved by the base coverage and exclusions in the policy. The base coverage is for damage or loss to physical assets only. There is no "business interruption" coverage whatsoever and losses caused by lack of incoming utility services, flood, and contamination are generally excluded.

This dispute exists, however, because attached to the base coverage provisions is a series of endorsements that

add further coverage to the base policy. Among the endorsements relevant to this dispute is a general "Gross Earnings Endorsement" that provides general business interruption coverage through the following terms:

> "In consideration of additional premium, this Policy is extended to cover the Actual Loss Sustained by the Insured during a Period of Interruption directly resulting from physical loss or damage of the type insured against by this Policy, to property not otherwise excluded by this Policy * * * ."[2]

Expressly, however, the coverage is limited to actual consequential losses that result when Siltec's insured property is physically lost or damaged as a result of a covered peril. Here, Siltec's business operations were impaired because utility service was interrupted, not because its insured property was physically damaged by the flood.

Two further endorsements, however, are specifically directed to utility service interruptions. One of the two is both relevant and central to the parties' respective positions on the coverage dispute.[3] Entitled "Service Interruption Endorsement (Time Element)," it provides, in part:

> "In consideration of additional premium, the Time Element [i.e., business interruption] coverage of this Policy is extended to cover the actual loss sustained caused directly by the interruption of the specified incoming services during a Period of Service Interruption, or if applicable, during the Restoration of Normal Operations, both as defined in this Endorsement.
>
> "* * * * *

---

[2] The Gross Earnings Endorsement further specifies that the losses covered are to make up for lost production or the inability to continue business operations or services in the event that Siltec "is wholly or partially prevented from producing goods or from continuing business operations or services." Covered economic losses include lost earnings and any expenses, "over and above normal operating expenses, necessarily incurred by the Insured in making up lost production or in reducing loss otherwise payable under this Endorsement."

[3] The other of the two—"Service Interruption Endorsement (Physical Damage)"—extends coverage only to physical loss or damage to Siltec's property as a result of interruption of utility services, such as water and sewer. Again, Siltec did not incur physical loss or damage to its property. Consequently, that endorsement is not applicable.

"Coverage is provided for loss resulting from interruption of the following specified incoming services: Gas, Water, Electricity, Telephone[,] by reason of any accidental [occurrence[4]] to the facilities of the following suppliers: Any Public Utility[,] that immediately prevents in whole or in part the delivery of useable services specified above to the following locations: As stated elsewhere in this Policy subject to the additional conditions of this Endorsement."

As those provisions suggest, and as the parties agree, that endorsement uses the terminology "time element" to refer to business interruption losses.[5] The net effect of the endorsement, therefore, is to extend the policy's more general "time element" coverage (*i.e.*, the business interruption coverage provided by the Gross Earnings Endorsement) to losses sustained due to interruption of useable water and sewer services. Thus, if the provisions quoted above were the full text of the endorsement, then Siltec's losses would be covered inasmuch as both types of Siltec's losses—lost revenue and the extra expenses incurred because of lack of water quality—were due to interruption of utility service.[6]

Significantly, however, the Service Interruption Endorsement contains specific exclusions that narrow the coverage. Flood and contamination are among the expressly stated exclusions:

"As respects this Endorsement, the exclusions in Part C. EXCLUSIONS of Form 3000 are deleted and replaced by:

"This Endorsement does not insure against loss or damage caused by the interruption of incoming services caused by or resulting from any of the following regardless of any

---

[1] The bracketed language reflects the text of the endorsement as of the date of the losses. An earlier version of the endorsement was also attached to the policy, and that earlier version is what the trial court discussed in its ruling. As the parties appear to agree, however, the bracketed language does not alter anything pertinent to this case and the trial court's analysis would not have been affected had it focused on the amended and operative version.

[5] For consistency and clarity, we use the term "business interruption" in lieu of "time element" whenever possible.

[6] For present purposes, we assume without deciding that the loss of sewer service qualifies as the loss of an incoming utility service. In fact, Protection Mutual disputes that point. Given our conclusion that the policy does not extend to the losses in any event, we need not resolve that particular question.

other cause or event contributing concurrently or in any other sequence to the loss:

"\* \* \* \* \*

"c. Flood, unless otherwise specifically provided else-where in this Policy with a Service Interruption Time Element Limit of Liability for Flood, but this exclusion does not apply to the Insured's loss as defined in the Time Element Coverage of this Policy resulting from fire, explosion, or sprinkler leakage caused by Flood at a supplier facility;

"\* \* \* \* \*

"e. [C]ontamination, including but not limited to pollution, unless such damage directly results from other physical damage not excluded by this Endorsement."[7]

By its express terms, then, the policy does not cover business interruption caused when a utility service is halted or not useable due to flooding at the utility site. To extend coverage to utility service interruption caused by a flood, a further endorsement (*i.e.*, "Service Interruption Time Element Limit of Liability for Flood") is required.[8] The parties agree on that much. They disagree, however, whether the policy contains that further endorsement.

In arguing that it does, Siltec points to the "Flood Endorsement," which provides, in part:

"In consideration of additional premium, and by deleting EXCLUSION No. 6 in GROUP A of Part C. EXCLUSIONS, this Policy is extended to cover *physical loss or damage* caused by or resulting from flood waters, waves, tide or tidal water, the release of water, the rising, overflowing, or breaking of boundaries of natural or man-made bodies of water, or the spray from any of the foregoing."

---

[7] Contamination as a cause of service interruption is covered only if the contamination results from covered physical damage. Beyond that, contamination-caused physical damage is excluded under the base coverage, as noted earlier. Apparently because of those limitations, Siltec does not argue that any of its losses fall within the scope of coverage for contamination.

[8] The Service Interruption Endorsement for physical damage to property likewise expressly excludes flood-caused and contamination-caused service interruption.

(Emphasis added.) That provision deletes the specific exclusion in the base coverage for flood damage and expressly clarifies that, due to the deletion, the policy extends to physical loss or damage to Siltec's covered property caused by flooding. Thus, the Flood Endorsement adds coverage for physical damage to covered property for an otherwise uncovered peril (flood).

Although nothing in the Flood Endorsement extends coverage to service interruption or to service interruption due to flooding, Siltec relies on a clause in the Flood Endorsement entitled "Limits of Liability," which states:

> "[Protection Mutual] shall not be liable under the terms of this Endorsement for more than the flood limits of liability specified elsewhere in this Policy for each occurrence and during any policy year. If this Policy includes Time Element Coverage, the foregoing limits shall be the maximum amount collectible under this Endorsement."

Siltec argues that the quoted language "expressly provides the restoration of coverage cross-referenced in the flood exclusion of the Service Interruption (Time Element) Endorsement."

We disagree. The Flood Endorsement adds coverage only for *property damage and loss* caused by flood, not interruption in business operations. The "Limits of Liability" clause that follows it, as quoted above, is not a coverage provision and does not alter or expand the scope of coverage. It sets the amount of Protection Mutual's liability for the added flood coverage. The cross-reference to any limit of liability applicable to business interruption ("time element") similarly is directed to liability limits and not to coverage. That cross-reference ensures that any *covered* business interruption due to flooding is indemnified to the extent of the liability limit applicable to that endorsement, if any, rather than to the extent of the Flood Endorsement liability limits. In short, the "Limits of Liability" clause does not, in and of itself, expand the scope of *coverage* for flood-related damage and loss. Rather, *coverage* for business interruption still depends on the terms of whatever endorsement provides that coverage.

In this policy, general business interruption ("time element") coverage is provided by the Gross Earnings

Endorsement, which insures Siltec against general economic losses that are a consequence of covered property damage and destruction. Combined, the Flood Endorsement and the Gross Earnings Endorsement indemnify Siltec for flood-caused loss or damage to its property, and also for lost business revenue or increased expenses if its business operations are impaired by flood damage to its property. Reading the two provisions together, the "Limitations of Liability" can only be understood to provide that, if Siltec incurs flood damage to its property, and if it then cannot operate its business because of the damaged or destroyed property, then the liability limits set by the Gross Earnings Endorsement control Protection Mutual's liability, rather than the limits contained in the Flood Endorsement alone.

■ On the other hand, the Service Interruption Endorsement specifies that, for flooding at the utility facility to be covered, there must be a "Service Interruption Time Element Limit of Liability for Flood" endorsement. Although it may not be important for the policy to contain a provision with that exact title, the policy must contain a provision that provides in substance what that title suggests: a liability limit specifically directed to business operation losses (*i.e.*, time element) caused by an interruption of utility service due to flooding. The liability limit contained in the Flood Endorsement does not satisfy that requirement because the coverage to which it relates—that is, the Gross Earnings Clause and the Flood Endorsement—does not encompass losses due to service interruptions of any kind. Nor does the underlying coverage extend to service interruptions caused by flooding. There simply is no provision in the policy, in title or substance, that satisfies the service interruption flood exclusion's requirement of a further endorsement.[9]

---

[9] Relatedly, Siltec also argues that the "Flood Limit of Liability Clause" in Part A of the policy provides the added endorsement referred to in the Service Interruption Endorsement to extend its provisions to flooding. That clause, however, merely provides a maximum coverage amount ($120 million) for any losses covered under the Flood Endorsement. There is no mention in that clause of coverage for service interruption events; in fact, its specific reference to the Flood Endorsement (Form 3301) suggests that it is limited to the "physical loss or damage" covered by that endorsement.

■     In sum, we agree with Protection Mutual that the "Limits of Liability" clause in the Flood Endorsement cannot plausibly be understood to be the special endorsement that the flood exclusion in the Service Interruption Endorsement requires. Because it cannot, we decline Siltec's invitation to construe the terms against Protection Mutual. *See Hoffman*, 313 Or at 470-71 ("when two or more competing, plausible interpretations prove to be reasonable * * * the rule of interpretation against the drafter of the language becomes applicable").[10] The only reasonable interpretation of the policy is that coverage in this circumstance required a further endorsement to cover service interruptions due to flooding at utility service facilities. That further endorsement is not contained in this policy. As a result, Siltec's losses due to flooding at Salem's water and water treatment sites are not covered.

■     Beyond Siltec's arguments based on its construction of the policy provisions, Siltec also urges us to consider extrinsic evidence, including evidence of its belief, based on negotiations leading to policy issuance, that the policy would cover its losses. The trial court, in ruling for Siltec, appears to have relied on some of that extrinsic evidence.[11] To the extent that the trial court did so, it did so in error. To the extent that

---

[10] Regarding Siltec's claim for expenses incurred as a result of the service interruptions, Siltec makes one further argument, but only by way of a summary and unanalyzed assertion in its brief. Specifically, Siltec contends that its added expenses for filtering the water were a result of direct flood damage to its property (*i.e.,* damaged filters), not water contamination. Suffice it to say, we consider that interpretation of the policy also to be implausible. The policy defines "flood" to mean actual flood waters, waves, tide or tidal waters, release of water, and other "rising, overflowing, or breaking of boundaries of natural or man-made bodies of water, or the spray from any of the foregoing." The turbid water did not flood Siltec's property, but instead flowed through Salem's water system and through Siltec's plumbing. The plumbing was Siltec's to turn on or turn off, to use or not use to supply water. Indeed, Siltec eventually chose not to use the water. Siltec's damage was due to contamination in the form of dirt particles flowing through the water system in the ordinary course. That qualifies as contamination, not flooding.

[11] The trial court also may have relied on the fact that a coinsurer had paid 10 percent of Protection Mutual's liability on the same risk under the same policy. Protection Mutual argues that "[w]hether, how, and for what reason" a different insurer chose to pay on the policy is irrelevant in construing the policy or in determining if it is ambiguous. Siltec, in response, does not defend the propriety of considering the coinsurer's payment, but instead argues that the trial court "did no such thing." To whatever extent the trial court did consider the coinsurer's decision to pay on the claim, we agree with Protection Mutual that it is not relevant to determining if the contract is ambiguous.

Siltec invites us to do the same, we are not at liberty to do so. A court can consider such extrinsic evidence in interpreting an insurance contract only if it first finds the policy to be ambiguous. *See Yogman v. Parrott*, 325 Or 358, 363, 937 P2d 1019 (1997) (contract interpretation); *ABCD...Vision v. Fireman's Fund Ins. Companies*, 84 Or App 645, 650, 734 P2d 1376, *rev'd and rem'd in part on other grounds* 304 Or 301, 744 P2d 998 (1987) (insurance contract interpretation). This commercial property damage policy is intricate, technical, and complicated. But that does not necessarily make it ambiguous. As we have already concluded, the policy permits only one plausible interpretation. There is no ambiguity that permits us to resort to extrinsic evidence.

We therefore reverse the trial court's entry of summary judgment in favor of Siltec on its breach of contract claim.[12] We remand for entry of summary judgment in favor of Protection Mutual on its claim for declaratory judgment. In light of our disposition, Siltec's counterclaims for negligent representation and estoppel are not moot. Consequently, we remand for further proceedings.

Reversed and remanded.

---

[12] Because we reverse the trial court's entry of summary judgment and supplemental judgment to Siltec, it is unnecessary to address Protection Mutual's second and third assignments of error regarding damages.