RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0199P (6th Cir.)
File Name: 03a0199p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――――

ST. MARYS FOUNDRY, INC.,
    *Plaintiff-Appellant,*

    *v.*

EMPLOYERS INSURANCE OF
WAUSAU,
    *Defendant-Appellee.*

No. 01-4183

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 00-07496—David A. Katz, District Judge.

Argued: March 14, 2003

Decided and Filed: June 16, 2003

Before: CLAY and ROGERS, Circuit Judges; COFFMAN,
District Judge.*

―――――――――――

### COUNSEL

**ARGUED:** Gary M. Glass, THOMPSON HINE LLP,
Cincinnati, Ohio, for Appellant. Robert J. Gilbertson,
ROBINS, KAPLAN, MILLER & CIRESI, Minneapolis,

―――――――――――

* The Honorable Jennifer B. Coffman, United States District Judge for
the Eastern and Western Districts of Kentucky, sitting by designation.

Minnesota, for Appellee. **ON BRIEF:** Gary M. Glass,
Kimberly E. Ramundo, THOMPSON HINE LLP, Cincinnati,
Ohio, for Appellant. Mel I. Dickstein, Michael P. McNamee,
ROBINS, KAPLAN, MILLER & CIRESI, Minneapolis,
Minnesota, for Appellee.

―――――――――――

### OPINION

―――――――――――

CLAY, Circuit Judge. Plaintiff St. Marys Foundry appeals
from an order awarding summary judgment to Defendant
Employers Insurance of Wausau, after Plaintiff filed a
complaint in federal diversity jurisdiction under 28 U.S.C.
§1332 for declaratory judgment pursuant to 28 U.S.C.
§§ 2201-2202, seeking a declaration that it was entitled to
insurance coverage for lost income following a warehouse
fire. For the reasons set forth below, we **AFFIRM** the district
court's order.

### FACTS

Plaintiff is located in St. Marys, Ohio, and manufactures
metal castings for customers in a wide variety of industries.
The castings range in size from 500 to 60,000 pounds, and
Plaintiff makes them by pouring molten iron into sand molds.
The sand molds are formed from wood "patterns." Each
pattern is custom made to produce a particular casting.
Plaintiff cannot manufacture castings without patterns. The
patterns Plaintiff uses to make castings are owned by
Plaintiff's customers. Consistent with industry practice,
Plaintiff stores the patterns when not using them. Plaintiff
stored approximately 4000 patterns in a warehouse known as
the Pattern Storage Warehouse.

On February 10, 2000, Defendant issued Business Property
Policy No. 226100053729 ("the Policy") to Plaintiff
providing insurance coverage for various interests including
the Pattern Storage Warehouse. The Policy provided

coverage for Plaintiff's property interests during the period from February 1, 2000 to February 1, 2001. As drafted and issued by Defendant, the Policy provided separate units of insurance for separate property interests, including coverage for real property, personal property, loss of income, additional expense, and equipment breakdown. The unit has terms set forth in separate coverage forms.

The Policy begins with a Declarations section which sets forth the total annual premium along with the Policy limits and deductibles. Immediately following the Declarations are the separate coverage forms. The Loss of Income Form provides, in pertinent part:

1.   COVERAGE

**We** will pay for:

A.   Loss of **income**; or,

B.   Necessary expenses which you incur to resume, or to maintain your ability to resume, normal operations, not exceeding the amount by which your loss of income is reduced;

that **you** sustain during a **period of recovery**, resulting from a **covered loss**, up to the **limit of liability** shown on the DECLARATIONS.

(J.A. at 56) (emphasis in original.) Under the Policy, "covered loss" means a "loss to covered property at a covered location resulting from a peril insured against." The Policy also includes a "Property Not Covered Endorsement" ("PNC Endorsement"), which expressly excludes coverage for patterns, dyes, and molds not owned by Plaintiff. The PNC Endorsement, however, modifies only the Personal Property Form.

On April 20, 2000, a fire destroyed the Pattern Storage Warehouse. As a result, Plaintiff suffered a loss of income in

excess of $900,000. Plaintiff concedes that the Policy does not cover the value of its customers' patterns, but claims entitlement to coverage for its business losses that resulted from the loss of the patterns.

When Defendant disagreed with Plaintiff's theory of coverage, Plaintiff filed a complaint for declaratory judgment in Ohio's Auglaize County Court of Common Pleas seeking a declaration that it was entitled to coverage for lost income. Pursuant to 28 U.S.C. §§ 1441 and 1446, Defendant removed the action to the United States District Court for the Northern District of Ohio.

Both parties filed cross motions for summary judgment on the issue of Plaintiff's coverage for loss of income under the Policy. On September 28, 2001, the district court denied Plaintiff's motion and granted Defendant's.

On October 25, 2001, Plaintiff filed a timely notice of appeal.

### DISCUSSION

We review summary judgment *de novo*. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 466 n.10 (1992); *Johnson v. Econ. Dev. Corp.*, 241 F.3d 501, 509 (6th Cir. 2001); *Buckeye Cmty. Hope Found. v. City of Cuyhaoga Falls*, 263 F.3d 627, 633 (6th Cir. 2001). Summary judgment is appropriate when there is no genuine issue of material fact such that the moving party is entitled to a judgment as a matter of law. *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 882 (6th Cir. 1996). The Supreme Court restated the framework governing motions for summary judgment in a 1986 series of cases: *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); and *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). In *Anderson v. Liberty Lobby, Inc.,* the Supreme Court explained that

[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of evidence that the plaintiff is entitled to a verdict.

477 U.S. 242, 322 (1986). The "mere possibility" of a factual dispute cannot create a triable case. *Gregg v. Allen-Bradley Co.,* 801 F.2d 859, 863 (6th Cir.1986). To avoid summary judgment, the plaintiff "must come forward with more persuasive evidence to support [his or her] claim than would otherwise be necessary." *Matsushita*, 475 U.S. at 586. If the defendant successfully demonstrates, after a reasonable period of discovery, that the plaintiff cannot produce sufficient evidence beyond the bare allegations of the complaint to support an essential element of his or her case, summary judgment is warranted. *Celotex*, 477 U.S. at 325. When determining whether to reach this conclusion, we draw all reasonable inferences in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000); *Smith v. Thornburg*, 136 F.3d 1070, 1074 (6th Cir. 1998).

## I.

In Ohio, normal rules of contract construction apply to the interpretation of insurance policies. *Weiss v. St. Paul Fire & Marine Ins. Co.*, 283 F.3d 790, 796 (6th Cir. 2002). Ohio courts first determine whether contract terms are ambiguous. *United Nat'l Ins. Co. v. SST Fitness Corp.,* 182 F.3d 447, 449 (6th Cir.1999). A term is ambiguous if it is reasonably susceptible of more than one meaning. *Weiss*, 283 F.3d at 796 (citing *King v. Nationwide Ins. Co.,* 519 N.E.2d 1380, 1383 (Ohio 1988)). If the terms of the contract are unambiguous the court determines the meaning of the contract. *Nationwide Mut. Fire Ins. Co. v. Guman Bros.*

*Farm,* 652 N.E.2d 684, 686 (Ohio1995). Ohio courts give the terms of the contract their plain and natural meaning. *Burdett Oxygen Co. v. Employers Surplus Lines Ins. Co.*, 419 F.2d 247, 248 (6th Cir. 1969); *Essex House v. St. Paul Fire & Marine Ins. Co.*, 404 F. Supp. 978, 986 (S.D. Ohio 1975). Following Ohio law, we must give meaning to every paragraph, clause, phrase, and word. *Affiliated FM Ins. Co. v. Owens-Corning Fiberglass Corp.,* 16 F.3d 684, 686 (6th Cir.1994). Finally, we cannot look to evidence outside of the policy where the contract is clear and unambiguous. *Kelly v. Med. Life Ins. Co.,* 509 N.E.2d 411, 413 (Ohio 1987).

When an insurance policy includes ambiguous exclusions, "'a general presumption arises to the effect that that which is not clearly excluded from the operation of such contract is included in the operation thereof.'" *Moorman v. Prudential Ins. Co. of Am.*, 445 N.E.2d 1122, 1124 (Ohio 1983) (quoting *Home Indem. Co. v. Plymouth*, 64 N.E.2d 248, 250 (Ohio 1945). The exclusion "must be stated clearly in explicit wording setting forth with specificity exactly what is to be excluded." *River Servs. Co. v. Hartford Accident & Indem. Co.,* 449 F.Supp. 622, 626 (N.D.Ohio 1977) (citing *Am. Fin. Corp. v. Fireman's Fund Ins. Co.,* 239 N.E.2d 33, 35 (Ohio 1968)). "The insurer, being the one who selects the language in the contract, must be specific in its use; an exclusion from liability must be clear and exact in order to be given effect." *Lane v. Grange Mut. Cos.,* 543 N.E.2d 488, 489 (Ohio 1989). As we explained in *Burdett*:

The basis of this rule is that the insurer—who formulates the insurance contract and proffers it to the insured for the ostensible benefit of the insured in the event of a loss—is responsible for the language employed. Furthermore, the purpose of the contract being to provide insurance coverage, an interpretation of doubtful terms which construes the language to provide such coverage tends to effectuate the presumed good faith intent of the contracting parties.

*Burdett*, 419 F.2d at 248-49. For these reasons, the insurer, not the insured, bears the burden of proving the applicability of an exclusion in its policy. *Cont'l Ins. Co. v. Louis Marx Co.,* 415 N.E.2d 315, 317 (Ohio 1980). Courts should not, however, construe an insurance contract against the insurer in the absence of ambiguity in its language. *Karabin v. State Auto. Mut. Ins. Co.,* 462 N.E.2d 403, 406 (Ohio 1984); *see also King,* 519 N.E.2d at 1383 (holding that only if provisions in an insurance contract are open to more than one interpretation should it "be construed strictly against the insurer and liberally in favor of the insured").

To restate the applicable law simply: we use ordinary principles of contract interpretation to determine whether an exclusion in an insurance policy is ambiguous. If the exclusion is ambiguous, we construe it in favor of affording coverage to the insured.

Plaintiff argues that the PNC Endorsement, which excludes coverage for patterns, only modifies the Personal Property Form. It does not, under Plaintiff's theory, modify the Loss of Income Form, which would mean that loss of income due to the destruction of the patterns is covered by the Loss of Income Form.

Plaintiff's position ignores the clear language of the Loss of Income Form. The Loss of Income form only includes loss of income "resulting from a *covered loss*." (J.A. at 56) (emphasis in original.) Under the Policy, "covered loss" means a "loss to covered property at a covered location resulting from a peril insured against." (J.A. at 72.) None of the other forms (Real Property, Additional Expense, Equipment Breakdown) have anything to do with the patterns. Thus, it appears fairly straightforward that the PNC Endorsement excludes the patterns from the property coverage, and the Policy only reimburses loss of income "resulting from a *covered loss*." (J.A. at 56) (emphasis in original.)

This exception is unambiguous, which means Plaintiff may not have the benefit of interpretive doctrines that require us to read an ambiguous exclusion in favor of coverage.[1] *See, e.g., Ramada Inn Ramogreen, Inc. v. Travelers Indem. Co.*, 835 F2d 812, 814 (11th Cir. 1988) (finding business interruption policy did not cover loss of patronage at an insured hotel resulting from a fire on the noncovered premises of the insured's restaurant) (applying Florida law); *Swedish Crucible Steel Co. v. Travelers Indem. Co.*, 387 F. Supp. 231, 233 (E.D. Mich. 1974) (finding business interruption insurance coverage only applied when property damage covered under the subject policy caused the business interruption loss) (applying Michigan law); *Gregory v. Cont'l Ins.* Co., 575 So.2d 534, 540 (Miss. 1990) (finding no coverage for business interruption claims resulting from damage to property at a non-covered location); *Protection Mut. Ins. Co. v. Mitsubishi Silicon Am. Corp.*, 992 P.2d 479, 483 (Or. Ct. App. 1999) (finding insured unentitled to business interruption coverage, where threat of imminent flooding at local water treatment facility, and not physical loss or damage to covered property, caused the insured's water service to be temporarily suspended).

## II.

Despite the Policy's plain language, Plaintiff launches a fusillade of unpersuasive arguments, each of which attempts to demonstrate that the patterns are a "covered loss."

First, Plaintiff argues that *Burdett Oxygen Co.*, 419 F.2d 247 (6th Cir. 1969), "is directly controlling." (Pl.'s Reply Br.

---

[1] Plaintiff concedes that the PNC Endorsement "withdraws insurance coverage for the cost of replacing the patterns owned by St. Marys' customers that were destroyed in the fire." (Pl.'s Br. at 16.) To reiterate the point, the patterns' property value was uninsured, which means their loss is not "covered" by the Policy. The Loss of Income Form then makes clear that coverage only extends to loss of income resulting from "covered" losses.

at 14.) In *Burdett*, like in this case, an insurer attempted to use property coverage exclusions to limit loss of income coverage. *Id*. at 249. The *Burdett* Court rejected the insurer's theory because the policy failed to "unambiguously condition [business interruption] recovery on the presence of insured property damage under the basic policy." *Id*. at 250. Unlike *Burdett*, Defendant's Loss of Income Policy made clear that it only applied to costs resulting from a "covered loss."

Second, Plaintiff argues that when Defendant intended for an endorsement to modify coverage under the Loss of Income Form, the Policy made the modification explicit. Plaintiff then gives two examples: the Law and Ordinance Extension of Coverage Endorsement and the Molten Material Extension. Each endorsement makes clear which forms it modifies through a series of checked boxes. On the Law and Ordinance Extension of Coverage Endorsement, the following items are checked:

(X) REAL PROPERTY FORM, WB1010
(X) PERSONAL PROPERTY FORM, WB1020
(X) LOSS OF INCOME FORM, WB1030
(X) ADDITIONAL EXPENSE FORM, WB1040
( ) LOSS OF RENTS FORM, WB1050
( ) EQUIPMENT BREAKDOWN FORM, WB1060

(J.A. at 90.) The Molten Material Extension contains a similar series of check-boxes.

Plaintiff's argument fails to account for the difference between policy *exclusions* (like the PNC Endorsement) and policy *extensions* (like the Molten Material and Law and Ordinance Extensions). A check-box on the PNC Endorsement would not have made sense because, without property coverage for the patterns, there was no loss of income coverage for them in the first place. Once the Policy excluded the patterns from property coverage, loss of income coverage was automatically excluded because patterns were no longer covered property.

With policy extensions like the Molten Metal and Law and Ordinance, the "Loss of Income" check-box reflects an option to add loss of income coverage to the extensions. The multiple check boxes allow the insured to choose what additional types of coverage will apply to the Extensions. One could purchase, for instance, a Molten Metal Extension for physical damage to property only, or, by checking the "Loss of Income" box, a Molten Metal Extension that includes Loss of Income coverage as well.

The Policy expressly excludes Loss of Income coverage for costs not resulting from a "covered loss," and the presence of check-boxes to modify the scope of policy extensions does not create ambiguity in either the Loss of Income Form or the PNC Exclusion.

Third, Plaintiff attempts to show that the Loss of Income Form protects personal property and loss of income as separate interests. If this is true, according to Plaintiff, the exclusion of personal property coverage in the PNC Exclusion would not necessarily modify the loss of income interest protected by the Loss of Income Form. Plaintiff notes that the Additional Deductibles Endorsement states that loss of income and personal property coverage are "separate units of insurance." (J.A. at 88.) It does not follow, however, that the Loss of Income Form protects both loss of income flowing from loss of personal property *and* other kinds of loss of income. "Personal property" is not itself a separate interest covered by the Loss of Income Form.[2] Plaintiff's attempt to parse the Policy into separate pieces fails to overcome Plaintiff's fundamental problem: the Loss of Income Form covers only losses from "covered property," and the PNC Exclusion renders the patterns uncovered.

---

[2]Personal property losses are covered, logically, by the Personal Property Form.

Fourth, the parties do not dispute that the Pattern Storage Warehouse was covered property at a covered location, destroyed by a covered peril.[3]  Plaintiff takes this to mean that it has suffered a "covered loss."  This interpretation fails because the Policy provides loss of income coverage only for income losses "*resulting from* a covered loss." (J.A. at 56) (emphasis added.)  Plaintiff lost income because the fire destroyed its customers' patterns, not because the Pattern Storage Warehouse burned. Had the conflagration destroyed the Warehouse but not its contents, presumably Plaintiff would not have lost any income at all.  The income loss "resulted" from the destruction of the uncovered patterns, not the destruction of the covered Pattern Storage Warehouse.[4]

Fifth, without citation, Plaintiff claims that its intangible "business operation" constitutes "covered property" under the Policy.  Significantly, Plaintiff failed to raise this argument below.  We generally "cannot consider an issue not passed on below." *Hormel v. Helvering*, 312 U.S. 552, 566 (1941); *see also Enertech Elec., Inc. v. Mahoning County Comm'rs*, 85 F.3d 257, 261 (6th Cir. 1996) (citing *Brickner v. Voinovich*, 977 F.2d 235, 238 (6th Cir. 1992)); *J.C. Wyckoff & Assoc., Inc. v. Standard Fire Ins. Co.,* 936 F.2d 1474, 1488 (6th Cir.1991).  Trial level litigation is  "'essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues . . . [and] in order that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce

---

[3] Defendant properly compensated Plaintiff more than $1,000,000 for damage to the Pattern Storage Warehouse itself.

[4] The loss of income at issue in this case "resulted from" the loss of the warehouse only in the most attenuated sense.  Here, the loss of the expressly excluded patterns *proximately* caused the income loss.  Even assuming, *arguendo*, that the destruction of the patterns would not have occurred *but for* the loss to the covered warehouse, it would carry causation too far to find coverage for an income loss so indirectly incurred.

evidence.'"  *Singleton v. Wulff*, 428 U.S. 106, 120 (1976) (quoting *Hormel*, 312 U.S. at 566).

The rule against considering an issue not passed on below is not jurisdictional, but a prudential guideline the Supreme Court termed a "rule of procedure." *Hormel*, 312 U.S. at 557. "Deviations are permitted in exceptional cases or particular circumstances, or when the rule would produce a plain miscarriage of justice." *Id*. at 558.  Rather than precisely defining the contours of this exception, the Court left the decision "primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Singleton*, 428 U.S. at 121.

We exercise our discretion to rule on an issue not decided below only in "exceptional cases." *Estate of Thomas P. Quirk v. Comm'r*, 928 F.2d 751, 756-57 (6th Cir. 1991).  This is because

[p]ropounding new arguments on appeal in attempting to prompt us to reverse the trial court—arguments never considered by the trial court—is not only somewhat devious, it undermines important judicial values.  The rule disciplines and preserves the respective functions of the trial and appellate courts.  If the rule were otherwise, we would be usurping the role of the first-level trial court with respect to the newly raised issue rather than reviewing the trial court's actions.  By thus obliterating any application of a standard of review, which may be more stringent than a *de novo* consideration of the issue, the parties could affect their chances of victory merely by calculating at which level to better pursue their theory.  Moreover, the opposing party would be effectively denied appellate review of the newly addressed issue, save in the rare instances of Supreme Court review.  In order to preserve the integrity of the appellate structure, we should not be considered a "second shot" forum, a forum where secondary, back-up theories may be mounted for the first time.

*Id*. at 757. No exceptional circumstances exist here. Plaintiff had the opportunity to raise its "business operation" argument below, but simply failed to do so. Thus, we will not consider it now.

Sixth, Plaintiff argues that because patterns are the heart of a foundry's business, Plaintiff reasonably expected that there would be coverage for any loss of income resulting from damage to the patterns. Put differently, Plaintiff reasonably expected coverage for its loss of income because the foundry's operation depended on the patterns such that the foundry and the patterns are "mutually dependent and if one fails, the other[] ordinarily suffer[s]." *Studley Box & Lumber Co. v. Nat'l Fire Ins. Co.*, 154 A. 337, 338 (N.H. 1931).

Plaintiff correctly notes that in *Andersen v. Highland House*, 757 N.E.2d 329 (Ohio 2001), the Ohio Supreme Court explained, "[i]t is not the responsibility of the insured to guess whether certain occurrences will or will not be covered based on nonspecific and generic words or phrases that could be construed in a variety of ways." *Id.* at 332. Thus, the Ohio courts will not bind an insured to unknown terms that produce a result beyond the range of how a reasonable insured would interpret the language.[5] *Id*. at 333. Yet Plaintiff's interpretation was not reasonable in light of the Policy's unambiguous exception. Courts generally seek to effectuate the insured's expectations—just not when those purported expectations clash with unequivocal contrary language.

---

[5]With respect to the *Andersen* decision, we observe that although the Ohio Supreme Court concluded that "[t]he legal effect of the reasonable belief on the part of Highland House and RMI is comparable to the effect of the reasonable-expectations doctrine," 757 N.E.2d at 343, the Ohio Supreme Court later noted that "there is not yet a majority of this court willing to accept the reasonable-expectations doctrine," *Wallace v. Balint*, 761 N.E.2d 598, 606 (Ohio 2002). Thus, Ohio law appears to accept that an ambiguous phrase should be interpreted in accordance with how a reasonable policyholder would understand the language, but not that courts must effectuate the policyholder's "reasonable expectations" regardless of the language.

*Andersen*, cited by Plaintiff, is distinguishable because the disputed policy in *Andersen* had language susceptible to more than one meaning.[6] 757 N.E.2d at 332-33.

For the same reason, the "mutual dependency" theory of *Studley Box* does not help Plaintiff. In *Studley Box*, the insured's policy included business interruption insurance for a particular set of buildings. *Studley Box*, 154 A. at 338. The court held that this coverage included losses that resulted from the destruction of a stable separated from the main buildings by some twenty feet, although the policy did not specifically describe the stable. *Id*. As the court explained, "*Without evidence to the contrary*, the object of the policies is clear [sic] to insure against loss from the interruption of the business as a whole, whatever part of it may be conducted in or with the property which suffers from the fire." *Id*. at 338 (emphasis added). The clear language of Defendant's Policy provides the necessary evidence to the contrary. *See Swedish Crucible*, 387 F. Supp. at 235 (distinguishing *Studley Box* based on the presence of clear exclusionary language in the disputed policy).

For all the forgoing reasons, we **AFFIRM** the district court's order.

---

[6]Plaintiff concedes this by describing *Andersen*'s holding this way: "*based on the ambiguous language in the policy*, the [*Andersen*] Court concluded that the insured could reasonably expect that its insurer would defend and indemnify it against claims related to potential premises hazards and that these types of claims would not be denied based on the *ambiguous* pollution exclusion." (Pl.'s Reply Br. at 5) (emphasis added).