**PURE TECH SYSTEMS, INC., an Ohio corporation, Plaintiff–Appellant,**

v.

**MT. HAWLEY INSURANCE COMPANY, a foreign corporation; General Star Indemnity Company, a foreign corporation, Defendants–Appellees.**

No. 02–3703.

United States Court of Appeals, Sixth Circuit.

March 26, 2004.

Before ROGERS and COOK, Circuit Judges, and BERTELSMAN, District Judge.*

ROGERS, Circuit Judge.

Plaintiff-appellant Pure Tech Systems, Inc. ("Pure Tech") operates a waste oil processing and recycling facility. In 1999, Pure Tech accepted a pair of 55-gallon drums of waste from a customer. One of the drums, unknown to Pure Tech, contained polychlorinated biphenyls, commonly termed "PCBs." When Pure Tech processed the waste. Pure Tech's oil separation/water reclamation system was contaminated. Pure Tech then submitted a claim for losses from the PCB-contamination under property insurance policies issued by defendants-appellees Mt. Hawley Insurance Company and General Star Indemnity Company (together, the "Insurers"). The Insurers denied Pure Tech's claim based on a pollution exclusion clause in the policies, and Pure Tech filed suit. The district court granted summary judgment in favor of the Insurers, ruling that the pollution exclusion applied to the loss from PCB contamination. Pure Tech appealed. Because the pollution exclusion unambiguously excludes coverage for the loss incurred in this case, we affirm the judgment of the district court.

## BACKGROUND

### 1. The Policies

Pure Tech operates a waste oil processing and recycling facility at 2655 Transport Road. Cleveland. Ohio (the "Facility"). At all times relevant to this suit, the Facility was insured by a pair of property insur-

ance policies issued by Mt. Hawley and General Star respectively.

The policies contain an identical pollution exclusion clause,[1] which reads as follows:

We will not pay for loss or damage caused by or resulting from any of the following:

. . . .

1. Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

The policies define "pollutants" as follows:

"Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Finally, the policies define "specified causes of loss" as follows:

Fire; lightening; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

### 2. The Loss

Pure Tech entered into an agreement with North East Chemical Corporation ("NEC") pursuant to which Pure Tech would receive waste material for process-

---

* The Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

1. The clause uses standardized language promulgated by an insurance industry group.

ing and recycling at the Facility. The agreement expressly forbade the acceptance of waste material containing PCBs.

On August 4, 1999, NEC entered into an agreement with the I–X Convention Center, I–X Center Warehousing Corporation, and Park Corporation (collectively, the "I–X Center") for the treatment/disposal of several drums of waste material profiled as "Soap Detergent—50%–60%: and Water, 50%–60%." On August 20 1999, pursuant to the agreement, NEC received two 55–gallon drums from the I–X Center. The drums were accompanied by a uniform hazardous waste manifest describing the waste as "DOT Non–Regulated Material."

On August 31, 1999, NEC emptied the drums received from the I–X Center into a Pure Tech tanker transport using the onboard vacuum pumping equipment contained within the tanker itself. In addition to the contents of the two 55–gallon drums, NEC consolidated other waste streams into the tanker. The resultant 4.700 gallons of waste material contained within the tanker was shipped to the Facility on August 31, 1999. Upon arrival at the Facility, the waste material was pumped from the tanker directly into a self-contained oil/water storage tank, where the material was subjected to an oil separation/water reclamation process.

On September 3, 1999, Pure Tech discovered the presence of PCBs above 50 ppm throughout the oil separation/water reclamation system at the Facility. The PCBs were contained entirely within the oil separation/water reclamation system and associated equipment. After an investigation, it was determined that the PCBs originated in one of the two 55–gallon drums that NEC received from the I–X Center.

The introduction of the PCBs into the oil separation/water reclamation process at the Facility resulted in the contamination of the Facility's storage tanks, pipes, pumps, and associated waste processing and recycling equipment. Consequently, Pure Tech submitted property damage and business interruption claims under the policies for (1) the removal and disposal of PCB-contaminated waste from the physical plant and equipment of the Facility, and (2) the decontamination and/or replacement of the Facility's PCB-contaminated storage tanks, pipes, pumps, and associated waste processing and recycling equipment. Pure Tech did not submit any claims for the removal and disposal of PCB-contaminated waste from any land, air, or water external to the physical plant and equipment of the Facility.

### 3. The Proceedings Below

On February 8, 2000, Pure Tech filed suit against Mt. Hawley and General Star in the United States District Court for the Northern District of Ohio, seeking monetary damages for breach of contract and for bad faith handling and payment of Pure Tech's claims. On April 4, 2000. General Star filed a cross-claim against Mt. Hawley, and, on July 3, 2000, Mt. Hawley filed a cross-claim against General Star. On August 14, 2000, Mt. Hawley and General Star filed a third-party complaint against NEC and the I–X Center. The cross-claims and third-party claims seek indemnification and/or contribution in the event that Mt. Hawley or General Star is found liable for monetary damages to Pure Tech.

On May 8, 2001, a magistrate judge filed a Report and Recommendation, which recommended that the district court deny Pure Tech's motion for summary judgment against the Insurers and grant the Insurers' motion for summary judgment against Pure Tech. The magistrate judge reasoned that the pollution exclusion applied to Pure Tech's claim, as the introduction of the

PCBs into Pure Tech's facility constituted a "dispersal" or "migration" of pollutants. On August 10, 2001, the district court entered an order adopting the magistrate judge's recommendation. In particular, the court stated that the magistrate judge's conclusion that "the mixing of the PCBs with other waste material and subsequent spreading of the material through Pure Tech's recycling system constituted 'dispersal' is well-reasoned."

On June 4, 2002, the district court certified its judgment as a final order under Federal Rule of Civil Procedure 54(b), finding that, because the grant of summary judgment in favor of the Insurers resolved all of the cross-claims and third-party claims, there was no just reason to delay an appeal of the summary judgment order. On June 20, 2002, Pure Tech filed a timely notice of appeal.

## ANALYSIS

### 1. Standard of Review

This court reviews de novo a district court's grant of summary judgment. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560 (6th Cir.1999). Summary judgment will be granted where there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party. *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002).

### 2. Canons of Construction for Insurance Contracts

"In Ohio, normal rules of contract construction apply to the interpretation of insurance policies." *St. Marys Foundry v. Employers Ins. of Wausau*, 332 F.3d 989,

992 (6th Cir.2003). Courts must give the words and phrases of an insurance policy their ordinary and usual meaning unless something in the contract indicates a contrary intention. *Ambrose v. State Farm Fire & Cas.*, 70 Ohio App.3d 797, 592 N.E.2d 868, 870 (1990). "When words used in a policy have a plain and ordinary meaning, it is neither necessary nor permissible to construe a different meaning." *Id.* (citing *Olmstead v. Lumbermens Mut. Ins. Co.*, 22 Ohio St.2d 212, 259 N.E.2d 123, 126 (1970)).

At the same time, an insurance contract prepared by the insurer "must be construed liberally in favor of the insured and strictly against the insurer if the language used is doubtful, uncertain or ambiguous." *Am. Fin. Corp. v. Fireman's Fund Ins. Co.*, 15 Ohio St.2d 171, 239 N.E.2d 33, 35 (1968). In particular, "[w]hen an insurance policy includes ambiguous exclusions, 'a general presumption arises to the effect that that which is not clearly excluded from the operation of such contract is included in the operation thereof.'" *St. Marys*, 332 F.3d at 992 (quoting *Moorman v. Prudential Ins. Co. of Am.*, 4 Ohio St.3d 20, 445 N.E.2d 1122, 1124 (1983)). The insurer bears the burden of proving the applicability of an exclusion in a policy. *Cont'l Ins. Co. v. Louis Marx Co., Inc.*, 64 Ohio St.2d 399, 415 N.E.2d 315, 317 (1980). In the final analysis, though, "[c]ourts should not ... construe an insurance contract against the insurer in the absence of ambiguity in its language." *St. Marys*, 332 F.3d at 993.

### 3. The "Dispersal" of the PCBs

█ Applying these canons of construction, we conclude that the pollution exclusion applies to Pure Tech's claim. Under the language of the exclusion, the insurers are not liable to Pure Tech for damage resulting from (1) a discharge, dispersal,

seepage, migration, release or escape, (2) of pollutants, (3) not caused by a specified cause of loss. This appeal turns on the first element because Pure Tech has stipulated that the PCBs at issue are "pollutants" and because, as discussed *infra,* Pure Tech has waived any argument that the PCB damage resulted from a "specified cause of loss."

As the district court properly concluded, the PCBs at issue were "dispersed." The term "disperse," as ordinarily understood, means "to cause to break up and go in different ways," "to cause to become spread widely," or "to spread or distribute from a fixed or constant source." *Webster's Third New International Dictionary* 653 (2002). According to the stipulated facts, the drum of waste material, which was contaminated by PCBs, was emptied into a tanker transport vehicle, where the waste material was consolidated with other waste material. Later, the waste material was pumped from the tanker into a self-contained oil/water storage tank at the Facility and subjected to an oil separation/water reclamation process. Thus, applying the usual meaning of the term, as the rules of interpretation require, the PCBs were "dispersed" throughout the waste material contained in the tanker, and later throughout Pure Tech's oil separation/water reclamation system and associated equipment.

Pure Tech offers a pair of "plain language" arguments in response. First, it contends that, by its plain language, the exclusion applies only to "traditional environmental contamination," on the theory that "discharge," "dispersal," "seepage," "migration," "release," and "escape" are environmental terms of art. However, Ohio law mandates that the court give policy terms "their ordinary and usual meaning." *Ambrose,* 592 N.E.2d at 870. Second, Pure Tech argues that the district court's ruling "rendered meaningless the terms 'discharge, dispersal, release, escape' because every pollutant becomes introduced to the premises in some fashion." But the use of a series of broad overlapping terms does not necessarily imply that there exists a residual category to which they do not extend. Such a list of terms may just as well have been intended to be comprehensive. In any event, the terms in question, as ordinarily understood, have ascertainable meanings, which the district court applied in its summary judgment ruling.

Pure Tech raises a bevy of additional arguments, most of which ignore the language at issue and none of which are convincing. In support, Pure Tech relies extensively upon *Anderson v. Highland House Co.,* 93 Ohio St.3d 547, 757 N.E.2d 329 (2001), a decision of the Ohio Supreme Court released after the district court's ruling in the instant case.

In *Anderson,* the owner of an apartment complex was sued when a resident of the complex died after inhaling carbon monoxide fumes from a faulty heating unit. *Id.* at 331. The owner sought indemnification under a commercial general liability ("CGL") policy, but its insurer denied covered based on a pollution exclusion similar in wording to the exclusion at bar.[2] *Id.* at 331–32. In concluding that the exclusion did not apply, the court held that "carbon monoxide emitted from a malfunctioning residential heater is not a pollutant under

---

**2.** Specifically, the exclusion provided that the policy did not apply to " 'Bodily injury' or 'property damage' arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollu-

tants." *Id.* at 331. The policy defined "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." *Id.* at 332.

the pollution exclusion of a comprehensive general liability policy unless specifically enumerated as such." *Id.* at 334.

Though *Anderson* seemingly resolved a narrow question, it arguably bespeaks a general method of interpreting pollution exclusions. Citing the rule that ambiguous terms—particularly ambiguous exclusions—are construed against the insurer, the court stressed that "if a policy does not plainly exclude a claim from coverage, then an insured may infer that the claim will be covered." *Id.* at 332. The court then observed that the pollution exclusion was written into CGL policies in order to shield insurers from "the enormous expense and exposure resulting from the explosion of *environmental* litigation." *Id.* at 334 (internal quotation omitted) (emphasis in the original). The court concluded that "[b]ased on the history and original purposes for the pollution exclusion, it was reasonable for [the insured] to believe that the policies purchased for their multiunit complex would not exclude claims for injuries due to carbon monoxide leaks." *Id.* at 333.

Invoking these passages, Pure Tech contends that *Anderson* "conclusively establishes that the district court erred in its attempt to determine how Ohio courts would apply the 'absolute' pollution exclusion." But *Anderson* does not require us to strain the language of the exclusion to find coverage in this case.

Pure Tech contends that *Anderson* "implicitly held that the 'absolute' pollution exclusion was so overly broad as to effectively be ambiguous." This assertion, as best we can decipher, subsumes two interrelated arguments: (1) *Anderson* establishes that the exclusion, as applied to the facts at bar, is ambiguous; and (2) *Anderson* branded the language of the exclusion so broad and general as to be meaningless and, hence, unenforceable.

Neither argument withstands scrutiny. The *Anderson* court held that a particular element of the exclusion—"pollutant"— was ambiguous as applied to the facts at issue—carbon monoxide emitted from a faulty heating unit. *Anderson* hardly mandates the conclusion that a separate element—"dispersal"—is ambiguous as applied to dissimilar facts—the introduction of PCBs from outside the premises. Likewise, the *Anderson* opinion by its terms does not hold that the exclusion was so broad as to be meaningless. There is therefore no basis for us to take the drastic step of holding that the exclusion, a standardized term routinely included in insurance contracts, is unenforceable on the ground of overbreadth. *See Stiriz v. Motorists Mut. Ins. Co.*, No. F–01–010, 2002 WL 479826, at \*5 (Ohio Ct.App. Mar. 29, 2002) (holding that the exclusion, as incorporated in a property insurance policy, was not "so broad and general as to eliminate all pollution coverage, thereby rendering the coverage language meaningless, against public policy, or unenforceable").

Pure Tech also argues that *Anderson* "implicitly recognized the reasonable-expectations doctrine in the context of the pollution exclusion." Under the reasonable-expectations doctrine, customers who adhere to standardized agreements "are not bound to unknown terms which are beyond the range of reasonable expectation." *Anderson*, 757 N.E.2d at 333 (quoting *Restatement (Second) of Contracts* § 211 cmt. f (1981)). However, although the *Anderson* court observed that "this rationale could apply to the case at bar," it made "no determination on the merits of the reasonable-expectations doctrine." *Id.* at 333. And in a subsequent decision, the Ohio Supreme Court observed that "there is not yet a majority on this court willing to accept the reasonable-expectations doctrine." *Wallace v. Balint*, 94 Ohio St.3d

182, 761 N.E.2d 598, 606 (2002). Thus, we would overstep our role as a federal court sitting in diversity if we applied the reasonable-expectations doctrine, a rule that Ohio Supreme Court has recently declined to adopt.

Pure Tech next advances a pair of arguments based on the "history" of the exclusion. Citing *Anderson* and other decisions interpreting CGL policies. Pure Tech explains that "the predominant motivation in drafting an exclusion for pollution-related injuries was the avoidance of the enormous expense and exposure resulting from the explosion of *environmental* litigation." *Anderson,* 757 N.E.2d at 334 (internal quotation omitted) (emphasis in original); *see also Owens–Corning Fiberglas Corp. v. Allstate Ins. Co.,* 74 Ohio Misc.2d 144, 660 N.E.2d 746, 750 (1993) ("It is evident that the standard pollution exclusion was devel-

oped over twenty years ago in response to insurers' concerns over *environmentally* related losses and liabilities." (emphasis in original)) This history, Pure Tech insists, demonstrates that the exclusion applies only to "traditional environmental contamination." Likewise, Pure Tech continues, courts reading the exclusion in light of its history have held that the exclusion does not preclude coverage of "injuries caused by toxic substances confined within the area of their intended use."

The "history" of the exclusion does not compel this court to disregard the plain language of the exclusion. First, the court is not at liberty to graft an additional term onto the exclusion based on the exclusion's history, especially a term as vague and potentially unworkable as "traditional environmental contamination."[3] *See St. Mar-*

---

**3.** Though by no means clear, it appears that Pure Tech would define "traditional environmental contamination" as the "discharge . . ." of "pollutants" *into or upon the land, the atmosphere or any watercourse or body of water.* The initial version of the exclusion drafted by the insurance industry contained the italicized language, and Pure Tech contends that the deletion of this language from the exclusion did not change its meaning. None of the cases cited by Pure Tech, however, warrant a departure from fundamental canons of construction by adding the "into or upon the land" clause–or some other formulation of "traditional environmental contamination"–to the version of the exclusion at issue.

The *Anderson* court does quote the following passage from a decision of the Illinois Supreme Court: "We would be remiss . . . if we were to simply look at the bare words of the exclusion, ignore its raison d'etre, and apply it to situations which do not remotely resemble traditional environmental contamination." *Anderson,* 757 N.E.2d at 332 (quoting *Am. States Ins. Co. v. Koloms,* 177 Ill.2d 473, 227 Ill.Dec. 149, 687 N.E.2d 72, 81 (1997)). However, the *Anderson* court quotes this passage during its explication of the rule that ambiguous terms are construed in favor of the insured, and it would stretch

*Anderson*'s holding to conclude that Ohio law requires the court to add the element of "traditional environmental contamination" to the unambiguous language of the exclusion.

The majority of the other decisions cited by Pure Tech simply stand for the proposition that toxic substances that cause injury while confined to their area of intended use have not been "discharged, dispersed, released or escaped"; these decisions apply the language of the exclusion to a particular scenario and do not read the element of "traditional environmental contamination" into the exclusion. *See Meridian Mut. Ins. Co. v. Kellman,* 197 F.3d 1178, 1183 (6th Cir.1999) (applying Michigan law) (holding that movement of fumes from chemicals used to seal a floor to the room below the floor being sealed did not constitute a "discharged, dispersal, seepage, migration, release or escape"); *Lumbermens Mut. Cas. Co. v. S–W Indus., Inc.,* 39 F.3d 1324, 1336 (6th Cir.1994) (applying Ohio law) (holding that fumes created by a rubber fabricating processes confined to that portion of the plant where the processes occurred were not "discharged, dispersed, released or escaped"); *Ctr. for Creative Studies v. Aetna Life & Cas. Co.,* 871 F.Supp. 941, 946 (E.D.Mich. 1994) (applying Michigan law) (holding that fumes from chemicals used to develop film, which injured a student developing film, were

*ys,* 332 F.3d at 992 (explaining that, under Ohio law, a court "cannot look to evidence outside of the policy where the contract is clear and unambiguous"). Second, even if we assume for the sake of argument that the exclusion does not apply to "injuries caused by toxic substances confined within the area of their intended use." this qualification does not rescue Pure Tech's claim. Pure Tech's agreement with NEC expressly forbade the acceptance of waste materials containing PCBs and, hence, the PCBs were not "confined within the area of their intended use." *Compare Meridian Mut. Ins. Co. v. Kellman,* 197 F.3d 1178, 1184 (6th Cir.1999) (holding that fumes from toxic chemicals used to seal a floor at a school, which injured a teacher in the room below sealed floor, were "confined within the general area of their intended use"): *Lumbermens Mut. Cas. Co. v. S–W Indus., Inc.,* 39 F.3d 1324, 1336 (6th Cir.1994) (holding that fumes from the plant's rubber fabricating processes, which injured an employee working in the area, were "confined within the area of their intended use").

Finally, Pure Tech argues that the district court's interpretation of the exclusion "results in the absurd—virtually no coverage to Plaintiff." Pure Tech asserts that because the exclusion defines "pollutant" as encompassing "waste" (which includes "materials to be recycled, reconditioned or reclaimed"), and because its business involves the movement, processing, and circulation of waste oil, the district court's interpretation "virtually eliminates all coverage."

Pure Tech's argument is unconvincing. This case does not present the issue of whether the waste material regularly accepted by Pure Tech in the course of its business qualifies as a "pollutant," and we decline to reach the issue. Further, the policies do cover damage resulting from the "dispersal" etc. of pollution if any one of the specified "causes of loss" causes the damage. Finally, from our reading, it appears that the policies cover a wide range of "property damage" having no arguable connection to "pollution."

In sum, the pollution exclusion at issue unambiguously precludes coverage of the loss from PCB contamination, and this court must enforce the policies as written. *St. Marys,* 332 F.3d at 993 (cautioning that, if a policy term is unambiguous, the insured "may not have the benefit of interpretative doctrines that require [a court] to read an ambiguous exclusion in favor of coverage").

### 4. Vandalism as a "Specified Cause of Loss"

On appeal, Pure Tech argues, for the first time, that the PCB contamination resulted from vandalism, a "specified cause of loss" under the policies. Pure Tech maintains that it preserved this argument in the parties' Stipulation of Undisputed Facts on their Cross–Motions for Summary Judgment on the Application of the Pollutants Exclusion, which reads in relevant part:

> By stipulating to those facts relevant to the determination of the application of

not "discharged, dispersed, released or escaped"). The remaining decisions either apply the original version of the exclusion, which contained the "into or upon land" clause, or do not interpret Ohio law. *West Am. Ins. Co. v. Tufco Flooring East, Inc.* 104 N.C.App. 312, 409 S.E.2d 692, 699 (1991), *overruled on other grounds by Gaston County*

*Dyeing Mach. Co. v. Northfield Ins. Co.,* 351 N.C. 293, 524 S.E.2d 558 (2000) (holding that, under North Carolina law, the exclusion applies only to discharges into the environment); *Owens–Corning,* 660 N.E.2d at 754 (holding that asbestos fibers "released" into the air inside a building were not "released" "into the atmosphere").

the "pollutants exclusion," the parties to this Stipulation do not intend to, nor do they[,] waive the later presentation of any other claim or defense they might have against each other.

Pure Tech requests that this court either find that the PCB contamination was the product of vandalism or remand the issue to the district court.

■ Pure Tech has waived its "vandalism" argument. Pure Tech concedes that it did not present this argument to the district court, and we conclude that Pure Tech did not preserve this issue in the stipulation. Quite plainly, the question of whether the loss in question was caused by a "specified cause of loss"—and, hence, not subject to the pollution exclusion—is part of "the determination of the application of the 'pollutants exclusion'" and not simply "any other claim or defense," as Pure Tech argues. The Insurers moved for summary judgment on the ground that the pollution exclusion precluded coverage of the damage from PCB contamination, and Pure Tech should have raised its argument that the clause did not apply because the damage was ·caused by vandalism—an argument based on the language of the clause itself—at this time.

In fact, during the proceedings below, Pure Tech was alerted to the necessity of presenting any "specified cause of loss" argument in response to the Insurers' motion for summary judgment. In its motion, the Insurers asserted that the PCB contamination was not caused by a "specified cause of loss." Similarly, in recommending that summary judgment be granted to the Insurers, the magistrate judge noted, "None of the parties appear to contend that the PCB contamination was a result of any of the specified causes of loss." Yet Pure Tech did not raise its "vandalism" argument at any point.

Finally, Pure Tech contends that, even if it did not preserve its "vandalism" argument, "justice" requires that the court consider the argument anyway. We are not persuaded that the instant cases presents "exceptional circumstances" compelling us to depart from our general practice of refusing to consider issues raised for the first time on appeal. *See In re Allied Supermarkets, Inc.*, 951 F.2d 718, 725 (6th Cir.1991) ("Although as a general rule federal appellate courts do not consider issues not passed on below, deviations are permitted in exceptional circumstances." (internal citation omitted)).

## CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED.**