*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0174p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

B & H MEDICAL, L.L.C., a Michigan limited liability company,

*Plaintiff-Appellant*,

STEPHEN M. RYAN, P.L.L.C. and STEPHEN M. RYAN, *Attorneys-Appellants (06-1339),*

*v.*

ABP ADMINISTRATION, INC.; WRIGHT & FILIPPIS, INC.,

*Defendants-Appellees.*

Nos. 04-2438; 06-1338/1339

>

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 02-73615—Gerald E. Rosen, District Judge.

Argued: March 14, 2008

Decided and Filed: May 7, 2008

Before: MOORE, GILMAN, and SUTTON, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Stephen M. Ryan, Bingham Farms, Michigan, for Appellant. John A. Cook, LAW OFFICE OF JOHN A. COOK, PLLC, Royal Oak, Michigan, for Appellees. **ON BRIEF:** Stephen M. Ryan, Bingham Farms, Michigan, for Appellant. John A. Cook, LAW OFFICE OF JOHN A. COOK, PLLC, Royal Oak, Michigan, Gerard Mantese, Mark C. Rossman, MANTESE & ROSSMAN, P.C., for Appellees.

———————————

## OPINION

———————————

KAREN NELSON MOORE, Circuit Judge. In this antitrust case, we consider the legality of an agreement between non-party Blue Cross Blue Shield of Michigan ("BCBSM") and the Defendants-Appellees, Wright & Filippis, Inc. and its subsidiary ABP Administration, Inc.

(collectively "W&F"). This agreement began in 1992 and established an exclusive network of preferred providers to supply durable medical equipment and prosthetics and orthotics to enrollees in certain health-benefits plans offered to Chrysler Corporation ("Chrysler") employees and retirees and later to certain employees and retirees of Ford Motor Company, as well as participants in the Michigan Public School Employees Retirement System ("MPSERS"). Following a competitive bidding process, BCBSM selected W&F to administer the network created by the contract, which has since been renewed multiple times. After its application to join this network was rejected in 2000, Plaintiff-Appellant B & H Medical, L.L.C. ("B&H"), filed this lawsuit in September 2002, attacking the network under the antitrust laws as an illegal exclusive-dealing arrangement that allegedly barred B&H from competing in the "sale, lease or rental of medical durable equipment and medical supplies to large insurance provider networks," which B&H claimed was the relevant market. Joint Appendix ("J.A.") at 32-34 (Am. Compl. at ¶¶ 6-13).

In a lengthy and well-reasoned opinion, the district court granted W&F's motion for summary judgment, rejecting B&H's definition of the relevant market and finding that B&H's antitrust claims failed for several reasons, among them that B&H failed to demonstrate antitrust standing and that the alleged exclusive-dealing agreement foreclosed no more than thirteen percent of a properly defined relevant market. The district court later granted in part W&F's motion for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure, imposing over $84,000 dollars in sanctions against Attorneys-Appellants Stephen M. Ryan, P.L.L.C., and Stephen M. Ryan (collectively "Ryan") for "failing to dismiss this case when a lengthy discovery period failed to disclose any support for the antitrust claims asserted in the complaint." *B & H Med., L.L.C. v. ABP Admin., Inc.*, 354 F. Supp. 2d 746, 748 (E.D. Mich. 2005). In addition to appealing the district court's grant of summary judgment, B&H also appeals a discovery order issued by the district court that limited B&H's efforts to obtain broad categories of information from nonparty BCBSM, and Ryan appeals the sanctions award. W&F filed a motion pursuant to Federal Rule of Appellate Procedure ("FRAP") 38 seeking the imposition of appellate sanctions against B&H and Ryan for pursuing a frivolous appeal.

For the reasons discussed below, we **AFFIRM** the district court in all respects and we **GRANT** W&F's motion for appellate sanctions.

## I. BACKGROUND

At the center of this case is an agreement, which BCBSM developed and which the parties refer to as the SUPPORT contract,[1] that empowered W&F to administer a closed network of suppliers of durable medical equipment ("DME")[2] and prosthetics and orthotics ("P&O") to enrollees in certain health-benefits plans that BCBSM offered to employees and retirees of three large employers in Michigan: Chrysler, Ford, and MPSERS.[3] W&F operates fewer than thirty retail outlets that sell DME/P&O to consumers, and to ensure access to DME/P&O services for covered enrollees throughout Michigan, the SUPPORT contract included a provision permitting W&F to

---

[1] The program's acronym SUPPORT stands for the Select Utilization of Providers for Prosthetic, Orthotic, and Rehabilitative Technology.

[2] DME includes "oxygen-related equipment, beds, and walkers." J.A. at 76 (Op. & Order Granting Summ. J. at 3).

[3] The SUPPORT program does not apply to employees and retirees of Chrysler, Ford, and MPSERS "who are enrolled in Blue Cross's health maintenance organization." J.A. at 980 (William J. Lynk Aff. at ¶ 13 n.16). The SUPPORT program "applies only to members who are enrolled in Blue Cross's traditional open-choice, fee-for-service coverage or in its preferred provider organization coverage." *Id.*

enter subcontracts with additional DME/P&O vendors.  B&H claimed that 296 out of the 644 DME/P&O outlets in Michigan, or forty-six percent, were members of the SUPPORT network.

At some point in 2000, B&H received admission to the SUPPORT network, but W&F soon terminated B&H's membership, claiming that it had mistakenly admitted B&H.  On September 10, 2002, B&H filed this lawsuit, alleging that the SUPPORT contract amounted to an illegal exclusive-dealing arrangement, constituted a refusal to deal with and a boycott of B&H, and an attempt to monopolize the DME/P&O market.

The discovery period in this case was lengthy, with the district court twice granting extensions to B&H, which "repeated[ly] fail[ed] to serve appropriately tailored document requests upon non-party BCBSM." *B & H Med.*, 354 F. Supp. 2d at 748 n.2.  The district court noted that B&H "has failed to explain why BCBSM should be required to serve as a source for information regarding the overall nature and economics of the DME/P&O market in Michigan," J.A. at 63 (Order Re: Pl.'s Mot. to Compel Produc. at 4), and, after B&H twice served broad subpoenas seeking information from BCBSM, the district court closely analyzed B&H's subpoena and granted in part B&H's motion to compel, imposing limitations in its Order on the broad categories of documents that B&H had requested.[4]

In its Supplemental Brief in Opposition to Summary Judgment, B&H argued that because the SUPPORT network included 296 out of the 644 outlets for DME/P&O services in Michigan, the alleged exclusive-dealing arrangement had foreclosed approximately forty-six percent of the market for DME/P&O services.  W&F countered that economic evidence assessed by its expert demonstrated the SUPPORT network accounted for only six and one-half percent of the DME/P&O sales revenue for the entire state of Michigan and just twelve and one-half percent of the DME/P&O sales revenue in the metropolitan Detroit area.  Using B&H's own financial records, W&F's expert also calculated that B&H's revenues had experienced 137.7% growth between 2001 and 2003 while B&H was excluded from the SUPPORT network.  W&F's expert also noted that the DME/P&O market did not have many barriers to entry and that 406 of the 644 DME outlets in Michigan were small, single-store operations.  Indeed, even B&H's economic expert stated that "[i]n a lot of respects, this market has the earmarks of being one that is fairly competitive in the standpoint that entry appears to be fairly easy."  J.A. at 1453 (Pisarkiewicz Dep. Tr. at 279).

In October 2004, the district court granted W&F's motion for summary judgment on all of B&H's claims.  The district court rejected B&H's attempt to define the relevant market as DME/P&O purchases made by individuals covered by a "large insurance provider network[]," reasoning that the proper market would include "***all*** purchases or rentals regardless of the source of payment."  J.A. at 92 (Op. & Order at 19).  The district court then explained that B&H's "percentage-of-outlets approach is uninformative" and that it "provides no meaningful insight into the market effects" of the SUPPORT contract upon the DME/P&O market in general.  J.A. at 99-100 (Op. & Order at 26-27).  In light of the evidence placing the sales revenue from the SUPPORT network's sales of DME/P&O to certain employees and retirees of Chrysler, Ford, and MPSERS at approximately thirteen percent of the DME/P&O market, the district court held "that [B&H] has failed as a matter of law to establish that the SUPPORT program has foreclosed competition in a substantial share of the relevant market" given that both sides "agree[d] that an exclusive dealing arrangement that forecloses 12.5 percent of the relevant market . . . does not run afoul of the 'substantial foreclosure' standard" of the Supreme Court's leading case on exclusive-dealing

---

[4] The district court remarked that it was "exceedingly difficult . . . to meaningfully assess [B&H's] document requests to BCBSM, when [B&H] steadfastly refuses, even at this late date, to disclose its specific theories of recovery in this case" and that B&H's "outstanding discovery requests to BCBSM seemingly have no bearing whatsoever on many of the issues presented in" W&F's motion for summary judgment.  J.A. at 64, 70 (Discovery Order at 5, 11).

arrangements, *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961).  J.A. at 104, 103 (Op. & Order at 31, 30).

The district court rejected B&H's various attacks on the exclusive-dealing characteristics of the SUPPORT network, noting that "exclusive dealing arrangements are not *per se* unlawful" and that "exclusive arrangements have their benefits as well, and these have been repeatedly recognized by the courts."  J.A. at 106, 105 (Op. & Order at 33, 32); *see also id.* at 104-110 (Op. & Order at 31-37).  The district court thus held that W&F was entitled to summary judgment on B&H's exclusive-dealing claim under § 1 of the Sherman Act, 15 U.S.C. § 1.

The district court similarly rejected B&H's § 2 monopolization claims, "observ[ing] that [B&H] and its expert have utterly failed to present any sort of cogent analysis of the market power possessed by W&F in any plausible DME/P&O market."  J.A. at 110 (Op. & Order at 37).  The district court also noted that "[t]here is absolutely no evidence that competitors have been excluded from the larger DME/P&O market—to the contrary, the record shows that B&H, at least, has enjoyed continued growth and strong performance in this market, despite its exclusion from the SUPPORT network."  J.A. at 112 (Op. & Order at 39).

Finally, beyond these flaws in B&H's claims under both §1 and § 2, the district court stated that an additional ground supported awarding summary judgment in favor of W&F:  B&H also failed to demonstrate any "antitrust injury" establishing its standing to assert a claim under antitrust law.  J.A. at 113-17 (Op. & Order at 40-44) (citing *Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972 (6th Cir. 2000)).  "While [B&H] has produced an expert opinion as to ***B&H's*** loss of anticipated income, the record is devoid of evidence that ***competition as a whole*** has suffered as a result of the exclusive SUPPORT program."  J.A. at 116 (Op. & Order at 43).

In January 2005, the district court issued an Opinion and Order granting in part W&F's motion seeking the imposition of sanctions against B&H and its attorney Ryan pursuant to Rule 11.  *B & H Med., L.L.C. v. ABP Admin., Inc.*, 354 F. Supp. 2d 746 (E.D. Mich. 2005).  The district court limited the award to "the fees incurred by [W&F] as a result of [B&H's] continued pursuit of its claims after discovery failed to reveal any facts or evidence that might lend support to these claims."  *Id.* at 747.  The district court stated that B&H "manifestly failed to suggest any ground for its continued opposition to [W&F's] motion for summary judgment" in that B&H "and its expert failed to provide any tenable evidence or theory of 'substantial foreclosure' in the relevant market of DME/P&O purchases, leases, and rentals."  *Id.* at 749.  "In short, rather than dismissing its exclusive dealing challenge upon failing to uncover any relevant economic data to support it, [B&H] advanced a theory which, if accepted, would condemn each and every exclusive dealing arrangement as violative of antitrust law."  *Id.*

Although the district court imposed sanctions against Ryan for failing to dismiss the case, the district court denied W&F's request to impose sanctions against the party B&H and also rejected W&F's request for sanctions based upon the filing of the lawsuit in the first place.  The district court described W&F's request for sanctions against the filing of the lawsuit as "present[ing] a close question," but the court concluded that sanctions were not appropriate because the legality of an exclusive-dealing arrangement "is a factual issue that can only be resolved after an opportunity for discovery" and that "the principal violation here was the continued pursuit of this litigation when discovery failed to uncover any evidentiary support for the claims asserted in the complaint."  *Id.* at 751.  For similar reasons, the district court refused to impose sanctions against B&H, stating that

B&H's "counsel bore the responsibility to impress upon his client that the record did not warrant the continued pursuit of this action." *Id.* at 752.[5]

B&H timely filed a notice of appeal from the district court's order granting summary judgment and the district court's discovery order limiting B&H's broadly worded subpoena of non-party BCBSM; Ryan timely filed a notice of appeal from the district court's order imposing sanctions under Rule 11. Prior to oral argument in our court, W&F filed a motion pursuant to FRAP 38 seeking the imposition of appellate sanctions against B&H and Ryan for pursuing a frivolous appeal.

## II. ANALYSIS

### A. B&H's Antitrust Claims

#### 1. Standard of Review

We review de novo a district court's ruling granting summary judgment. *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 523 (6th Cir. 2007). We will affirm a grant of summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In reviewing the district court's decision to grant summary judgment, we must view all evidence in the light most favorable to the nonmoving party." *Blair*, 505 F.3d at 523.

#### 2. Analysis

The record in this case clearly demonstrates that B&H's antitrust claims lack any conceivable merit. As the analysis in the district court's thorough opinion demonstrated, B&H's claims suffer from numerous fatal defects: the lack of evidence defining a relevant market; the lack of evidence suggesting that the SUPPORT contract has allowed W&F to foreclose a substantial portion of the DME/P&O market in Michigan through its exclusive[6] arrangement for providing DME/P&O services to certain employees and retirees of Chrysler, Ford, and the MPSERS; and the lack of evidence demonstrating an injury to competition establishing B&H's antitrust standing.

In its opening brief on appeal, B&H failed to challenge the district court's finding that B&H had not shown any antitrust injury and therefore had no antitrust standing, and we may affirm the district court's judgment on this ground alone.[7] *See Priddy v. Edelman*, 883 F.2d 438, 446 (6th Cir. 1989) ("We normally decline to consider issues not raised in the appellant's opening brief."). Although B&H's failure to challenge one of the grounds on which the district court ruled against it dooms its appeal, after discussing antitrust standing we will briefly address B&H's other

---

[5]In January 2006, the district court issued a second Opinion and Order relating to sanctions, setting the amount at $84,512.11 after W&F submitted its costs and Ryan contested certain of those costs. J.A. at 131-38 (Second Sanctions Op. & Order); *see also B & H Med., L.L.C. v. ABP Admin., Inc.*, No. 02-73615, 2006 WL 123785 (E.D. Mich. Jan 13, 2006).

[6]In fact, the employees and retirees of the above-mentioned companies who have enrolled in BCBSM plans covered by the SUPPORT contract *are* able to purchase DME/P&O services from vendors, like B&H, that are not members of the SUPPORT network. Plan enrollees may purchase DME/P&O services outside the SUPPORT network subject to paying an "out-of-network sanction." J.A. at 80 (Op. & Order at 7).

[7]The Statement of Issues Presented portion of B&H's brief did not include any reference to an argument that B&H showed antitrust injury and has antitrust standing, Appellant Br. at 2-3, and no such argument appeared anywhere in its opening brief.

arguments because their resolution is relevant to B&H's appeal of the Rule 11 sanctions and W&F's motion pursuant to FRAP 38 for appellate sanctions.

### a. Antitrust Standing

Antitrust "[p]laintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (en banc) ("Antitrust injury . . . is a 'necessary, but not always sufficient,' condition of antitrust standing.") (quoting *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986)). "The antitrust laws . . . were enacted for 'the protection of competition not competitors,'" *Brunswick*, 429 U.S. at 488 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)), and we have held that a district court appropriately dismissed a lawsuit for failing to state a claim when "the only harm allegedly suffered by [the plaintiff] was in the company's capacity as a competitor in the marketplace, not as a defender of marketplace competition" and the record "present[ed] no indication that *competition* itself was harmed by any act of the defendants." *Indeck*, 250 F.3d at 977.

As stated above, B&H failed to discuss antitrust standing in its opening brief even though the district court explicitly stated that the absence of antitrust injury was an "additional ground[] for granting summary judgment in [W&F's] favor." J.A. at 113 (Op. & Order at 40). Even after W&F included a section in its appellate brief arguing that the district court properly found that B&H suffered no antitrust injury, Appellee Br. at 44-46, B&H devoted only a total of three sentences in its Reply Brief to the issue of its antitrust standing and then misstated the record, Reply Br. at 26-27. In its Reply Brief, B&H charged that "[o]nce again, W&F distorts the record below by claiming that B&H demonstrated no harm to competition but only damages to B&H." Reply Br. at 26. But *B&H* is the party who distorts the record: the district court explicitly stated that although B&H "has produced an expert opinion as to *B&H's* loss of anticipated income, the record is devoid of evidence that *competition as a whole* has suffered as a result of the exclusive SUPPORT program." J.A. at 116 (Op. & Order at 43).

B&H's Reply Brief ignored the district court's explicit finding on this point, and B&H merely referred to a section of the affidavit submitted by its expert witness without quoting from it or explaining how it demonstrated injury to competition and why the district court was wrong on this point. Reply Br. at 26-27 (citing J.A. at 1658-67 (Pisarkiewicz Aff. at 20-29)). Furthermore, in the cited pages B&H's expert merely referred to "a strong consumer backlash against the restrictive policies of HMO's" and even conceded that "it does appear that Chrysler obtained sharp discounts from W&F." J.A. at 1660, 1666 (Pisarkiewicz Aff. at 20, 28)). The district court observed that B&H presented "no evidence, for example, that DME/P&O providers have been driven out of business or that consumers have been saddled with poor quality goods or services," and the court further noted that "the limited duration of the SUPPORT contract affords BCBSM and its customers . . . the periodic opportunity to make different arrangements if the SUPPORT program or [W&F's] performance is not achieving the desired objectives." J.A. at 116-17 (Op. & Order at 43-44).

We hold that the district court properly granted summary judgment in favor of W&F on the ground that B&H failed to demonstrate any antitrust injury.

### b. B&H's Exclusive-Dealing Claim Fails as a Matter of Law

Under governing Supreme Court precedent, the legality of the SUPPORT network is not a close question. In *Tampa Electric*, the Supreme Court provided the standard for analyzing exclusive-dealing arrangements, stating that "the competition foreclosed by the contract must be found to constitute a *substantial share* of the relevant market." 365 U.S. at 328 (emphasis added).

Courts routinely observe that "foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent." *See, e.g.*, *Stop & Shop Supermarket Co. v Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004).

B&H lacked any reasonable theory by which its evidence satisfied the basic "substantial foreclosure" threshold necessary to prevail on an exclusive-dealing claim. B&H asserted that the evidence in this case satisfied the "substantial foreclosure" threshold purely on the basis of observing that forty-six percent of DME/P&O retail outlets in Michigan were members of the SUPPORT network, without regard to any sales or revenue data. J.A. at 1616 (B&H's Supplemental Summ. J. Br. at 10) (stating expert's "conclu[sion] that B&H and other DME competitors are being excluded from networks which account for 46 percent of the DME provider outlets across the state of Michigan for the large insurance provider networks"). Revenue data for the SUPPORT network, as well as estimates for the total size of the market for DME/P&O in Michigan, did exist, and W&F's expert determined that the SUPPORT network accounted for only six and one-half percent of the DME/P&O sales revenue for the entire state of Michigan and just twelve and one-half percent of the DME/P&O sales revenue in the metropolitan Detroit area.

On appeal, B&H essentially repeats its argument that a provider-based percentage of participating DME/P&O outlets is meaningful, without responding to the district court's criticism of that measure as "pointless and perverse." J.A. at 99 (Op. & Order at 26); Appellant Br. at 17-20, 33. Further, B&H grossly distorts the district court's reasoning on this point. B&H claims that the district court incorrectly rejected the analysis of B&H's economic expert because the analysis was based on a "pointless and perverse" method of estimating market shares, and B&H then falsely claims that "the Court cited approvingly the use by W&F's economic expert, Dr. Lynk, of the precise same numerical fraction except that Dr. Lynk excluded from his numerator any [SUPPORT] providers other than W&F['s outlets]." Appellant Br. at 18 (citing J.A. at 98). In fact, in the passage of the district court opinion that B&H quotes in its brief, the district court was *clearly* referring to the economic evidence regarding the *sales revenue* generated by outlets in the SUPPORT network, *not* simply a crude percentage of W&F outlets or SUPPORT outlets of the total in the state. J.A. at 98 (Opinion & Order at 25).

We hold that the alleged exclusive-dealing arrangement in this case does not violate the antitrust laws because the evidence shows that the SUPPORT program foreclosed access to less than thirteen percent of the relevant market.

### c. B&H's § 2 Claims

By devoting a mere seven sentences to its claims of monopolization and attempted monopolization under § 2, *see* Appellant Br. at 40-41, B&H effectively waived its §2 claims. *See United States v. Corrado*, 304 F.3d 593, 611 n.12 (6th Cir. 2002) ("Arguments not developed in briefs on appeal are deemed waived by this court . . . .").

### d. B&H's New Arguments

B&H devoted large portions of its Opening Brief and its Reply Brief to arguing, for the first time in this case, that the principal problem with the SUPPORT network is that it amounts to a price-fixing conspiracy. *See* Appellant Br. at 21 ("All of these providers in the Support Network have come together and agreed to accept a fee schedule, so there is a horizontal price fixing agreement . . . "); Appellant Br. at 27-28 (stating that "'[n]aked' agreements among competitors to fix prices are *per se* illegal" and that "[t]he Support [Network] is *per se* illegal"); Reply Br. at 7 (stating the SUPPORT contracts "are primarily price fixing agreements"); *id.* at 10 (stating the SUPPORT contracts "just happen to be primarily price fixing agreements"). *Nowhere* below did B&H describe the SUPPORT network as a conspiracy to fix prices. The phrase "price fixing" does not appear

anywhere in B&H's Amended Complaint.[8]  J.A. at 33-37 (Am. Compl.).  Rather, the entire case focused on whether the SUPPORT network was an exclusive-dealing arrangement that potentially foreclosed a substantial portion of the market.

B&H claims that its price-fixing arguments are not new because courts analyze both price fixing and exclusive dealing under § 1 of the Sherman Act, which prohibits unreasonable restraints of trade, Reply Br. at 7-8, but this argument manifestly lacks merit and borders on bad faith.  Price fixing and exclusive dealing are two entirely separate theories of antitrust liability, with vastly different applicable standards and analyses relying on very different kinds of evidence.

"We generally 'cannot consider an issue not passed on below,'" and "[w]e exercise our discretion to rule on an issue not decided below only in 'exceptional cases.'"  *St. Mary's Foundry, Inc. v. Employers Ins. of Wausau*, 332 F.3d 989, 995-96 (6th Cir. 2003) (quotations omitted).  This is not such an exceptional case.

Similarly, on appeal, B&H also relies heavily, for the first time, on Statements 8 and 9 from the U.S. Department of Justice and Federal Trade Commission's Statements of Antitrust Enforcement Policy in Health Care (Aug. 1996), *available at* http://www.usdoj.gov/atr/public/guidelines/0000.pdf ("Health Care Enforcement Guidelines").  Although it is not improper for a party to cite a case or an authority to an appellate court for the first time, *see Costantino v. TRW, Inc.*, 13 F.3d 969, 981 n.13 (6th Cir. 1994), Statements 8 and 9, and particularly B&H's use of them,[9] primarily concern a price-fixing theory of liability, which B&H *did not* assert below.  We therefore decline to address B&H's arguments that, under Statements 8 and 9, the SUPPORT network is an illegal agreement to fix prices because B&H did not present this theory of antitrust liability to the district court.  *See St. Mary's Foundry*, 332 F.3d at 995-96.

## B.  B&H's Discovery Claim

### 1.  Standard of Review

"When reviewing a district court's decision to limit discovery, we will intervene only if the decision was an abuse of discretion resulting in substantial prejudice."  *Hahn v. Star Bank*, 190 F.3d 708, 719 (6th Cir. 1999).

### 2.  Analysis

As with its antitrust claims, B&H's appeal of the district court's discovery order, which limited B&H's efforts to obtain broad categories of information from nonparty BCBSM, suffers from fatal flaws.  W&F correctly observes that, although B&H devoted a large portion of its

---

[8]In fact, in its initial Complaint, B&H *did* allege that W&F "engaged in price fixing to deny B&H access to the relevant market," J.A. at 22 (Compl. at ¶ 14), but it *dropped* this claim in its Amended Complaint and accordingly may not rely on that theory.  *See Drake v. City of Detroit*, No. 06-1817, 2008 WL 482283, at *2 (6th Cir. Feb. 21, 2008) (stating that a prior "complaint is a nullity, because an amended complaint supercedes all prior complaints"); *see also* 6 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1476 (2d ed. 1990) (stating that "[a] pleading that has been amended under Rule 15(a) supersedes the pleading it modifies" and that "[o]nce an amended pleading is interposed, the original pleading no longer performs any function in the case").

[9]Terming the SUPPORT program a "provider-controlled contracting network," or "PCN," B&H asserts that in "an antitrust analysis of the Support PCN under Statement 9, the first question is whether the Support PCN should be analyzed as *per se* illegal or under the rule of reason."  Appellant Br. at 28.  B&H then declares that "the Support PCN is a cartel or a 'sham' network which is *per se* illegal because 'antitrust law condemns naked agreements among competitors which fix prices or allocate markets.'"  *Id.* (quoting Statement 9, Health Care Enforcement Guidelines at 135).  Finally, B&H argues that "under a rule of reason analysis pursuant to Statements 8 and 9, the issues are four:  (1) determine if *the horizontal price fixing agreement* is ancillary . . . ."  Appellant Br. at 32 (emphasis added).

appellate brief to complaints about the discovery process, *nowhere* did B&H include a discussion of the standard of review for such claims. As it apparently did before the district court, on appeal B&H simply asserts that the additional discovery was necessary, without offering any reasonable explanation for why information possessed by BCBSM would have assisted B&H's efforts to define properly a relevant market and estimate the percentage of DME/P&O business foreclosed by the agreement that established the SUPPORT network as the exclusive source for DME/P&O services for certain employees and retirees of Chrysler, Ford, and the MPSERS. Indeed, much of B&H's "argument" relating to the discovery issue appears in its "Statement of the Case" portion of its brief, where B&H declares that it "was denied *legitimate* discovery in the proceedings below." Appellant Br. at 7 (emphasis added).

We affirm the district court's discovery order because B&H has failed to demonstrate either that the district court abused its discretion in limiting B&H's efforts to obtain information from nonparty BCBSM or that its meritless antitrust claims were substantially prejudiced by the limited discovery.

## C. Ryan's Appeal of the Rule 11 Sanctions

### 1. Standard of Review

"We review a district court's imposition of sanctions pursuant to Federal Rule of Civil Procedure 11 for abuse of discretion." *Tropf v. Fidelity Nat'l Title Ins. Co.*, 289 F.3d 929, 936 (6th Cir. 2002).

### 2. Analysis

As the above analysis has demonstrated, B&H and Ryan pursued (and have appealed) an obviously meritless antitrust lawsuit long beyond the time at which discovery demonstrated that the claims lacked support. The district court's summary judgment opinion, as well as its two opinions relating to sanctions, show that the court carefully analyzed all the claims in this case and pointed out the numerous flaws plaguing B&H's theories and evidence. On appeal, Ryan's argument pertaining to the sanctions largely repeats complaints earlier in the brief regarding the denied discovery, continuing to assert without reasoned explanation that the extra discovery would have somehow assisted the lawsuit. The district court expressed "frustration at the apparent inability of [B&H] and its counsel to explain how a particular discovery request was reasonably calculated to lead to the discovery of evidence bearing upon a viable theory of antitrust liability." *B & H Med.*, 354 F. Supp. 2d at 751. Indeed, two of the most obvious flaws in B&H's lawsuit were the failure to show an antitrust injury to competition and the failure to show that the SUPPORT network foreclosed a substantial portion of the market; additional information from BCBSM would not have assisted B&H on either point.

We conclude that the district court did not abuse its discretion in imposing sanctions against Ryan pursuant to Rule 11.

## D. W&F's Motion for Appellate Sanctions Pursuant to FRAP 38

### 1. Standard for Evaluation of Motions Under FRAP 38

FRAP 38 provides that "[i]f a court of appeals determines that an appeal is frivolous, it may, after a separately filed motion or notice from the court and reasonable opportunity to respond, award just damages and single or double costs to the appellee." In *Wilton Corp. v. Ashland Castings Corp.*, 188 F.3d 670 (6th Cir. 1999), we held that sanctions under FRAP 38 were appropriate when an appeal is "wholly without merit" and when the appellant's "arguments essentially had no reasonable expectation of altering the district court's judgment based on law or fact." *Id.* at 677. We have

"conclud[ed] that a finding of bad faith is not required before sanctions under Rule 38 may be imposed by this court." *Id.*; *see also Tareco Props., Inc. v. Morriss*, 321 F.3d 545, 550 (6th Cir. 2003) ("An appellee does not have to demonstrate that the appellant or his attorneys acted in bad faith to succeed on a motion for sanctions.") (citing *Jones v. Continental Corp.*, 789 F.2d 1225, 1230 (6th Cir. 1986)). Nonetheless, we have observed that "[w]e will *usually* impose Rule 38 . . . sanctions only where there was some improper purpose, such as harassment or delay, behind the appeal." *Barney v. Holzer Clinic, Ltd.*, 110 F.3d 1207, 1212 (6th Cir. 1997) (emphasis added).

Other circuits approach requests for appellate sanctions in a similar fashion. In one particularly relevant case from the Fifth Circuit, that court imposed a sanction of double costs in an antitrust case when "appellate counsel made no attempt to address most of the issues raised in the district court's opinion." *Olympia Co. v. Celotex Corp.*, 771 F.2d 888, 893 (5th Cir. 1985). The court further stated that "[w]hile we realize that the lack of damages or injury was enough to dispose of [the plaintiff's] action, we note that [the plaintiff] did not address enough of the requisite elements to obtain reversal on any of its substantive claims." *Id.* Other courts of appeals have found appellate sanctions appropriate when appellants have "failed to explain how the district court decision was in error," including failing to discuss key aspects of the court's holding, *Spiegel v. Continental Ill. Nat'l Bank*, 790 F.2d 638, 650 (7th Cir. 1986), and when appellants "merely reiterate[] the arguments [they] made to the district court" and that the district court sanctioned below, *Optyl Eyewear Fashion Int'l Corp. v. Style Cos.*, 760 F.2d 1045, 1052 (9th Cir. 1985).

### 2. Analysis

Our analysis above has already highlighted the numerous blatant deficiencies in B&H's lawsuit, as well as the improper and baseless nature of its appellate briefing. Here we summarize the most egregious examples of B&H and Ryan's conduct in support of our decision to impose sanctions against both.

First, perhaps the most frivolous and sanction-worthy aspect of this appeal is B&H's entirely new argument that the SUPPORT network constituted a price-fixing conspiracy when it *never* pursued such a theory in the district court. Given that arguments relating to price fixing constitute a large portion of B&H's appellate brief, this conduct alone might warrant sanctions.

Second, although B&H dedicated substantial space in its briefing to propounding a brand new theory of liability, in its opening brief B&H neglected to challenge the district court's crucial determination that B&H lacked antitrust standing because B&H had failed to show that the SUPPORT network had caused an injury to competition. Even when W&F argued this point in its responsive brief, B&H offered only three conclusory sentences in its Reply Brief to purport to show that it had demonstrated an injury to competition and satisfied the requirements of antitrust standing. B&H could not possibly prevail on any of its antitrust claims without demonstrating that it had antitrust standing,[10] and the district court clearly rested its decision to grant W&F's motion for summary judgment in part on the lack of antitrust standing. *See* J.A. at 113-17 (Op. & Order Granting Summ. J. at 40-44). B&H's effective failure to challenge the antitrust-standing basis of the district court's decision renders the remainder of its antitrust appeal essentially meaningless.

Third, the district court imposed, and we affirm, Rule 11 sanctions against Ryan for "failing to dismiss this case when a lengthy discovery period failed to disclose any support for the antitrust claims asserted in the complaint." *B & H Med.*, 354 F. Supp. 2d at 748. Indeed, the district court

---

[10] Indeed, we have recently held that the absence of antitrust standing is an appropriate ground on which to dismiss a complaint for failing to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 449 (6th Cir. 2007) (en banc) ("[W]e not only may—but we must—reject claims under Rule 12(b)(6) when antitrust standing is missing.").

stated that it was a "close question" whether Rule 11 sanctions were warranted against B&H and Ryan simply *for filing the lawsuit at all*. *Id.* at 751. B&H should have voluntarily dismissed this case at the close of discovery; pursuing an appeal—especially one that raises entirely new theories of liability and fails to challenge crucial grounds of the district court's opinion—is the essence of frivolity.

Our final consideration is whether to impose sanctions against Ryan only or against B&H as well. The district court elected not to impose sanctions pursuant to Rule 11 against B&H because it found that "counsel bore the responsibility to impress upon his client that the record did not warrant the continued pursuit of this action." *Id.* at 752. At that point, however, B&H should have been well aware of the many fundamental weaknesses in its case and it should not have requested that Ryan pursue its antitrust claims on appeal. We therefore find that B&H and Ryan must jointly pay W&F the costs incurred in defending this appeal. W&F shall have fifteen days from the filing of this opinion to file an affidavit setting forth the hourly rates of their counsel and the number of hours spent in defending this appeal, and whatever documentation and argument in support thereof they deem appropriate. B&H and Ryan may then file a response to this documentation within ten days. *See Tareco Props.*, 321 F.3d at 550 (citing *Wilton Corp.*, 188 F.3d at 678 (Gilman, J., concurring)); *see also Blachy v. Butcher*, 129 F. App'x 173, 181 (6th Cir. 2005).

We do note that the decision to impose appellate sanctions is a difficult one, and "[w]e do not wish to chill any appeal, especially in the criminal context, which involves serious, controversial, doubtful, or even novel questions." *Wilton Corp.*, 188 F.3d at 677. Sanctions are not appropriate simply because an appellant's case "may indeed be quite weak," *Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 308 (6th Cir. 2008), and we generally impose sanctions only in the rare case when an appeal involves "an improper purpose, such as harassment or delay," *Barney*, 110 F.3d at 1212, or when, as here, an appeal consists of baseless or improperly raised arguments, *see Blachy*, 129 F. App'x at 181 (6th Cir. 2005) (granting motion for FRAP 38 sanctions when "[t]he result of the [appellants'] appeal was obvious since their arguments were either untimely, could not be raised for the first time to this Court, or were objectively meritless").

In sum, B&H's antitrust claims lack any conceivable merit, and this has been apparent for a long time. B&H's appeal failed to address meaningfully the district court's reasoning regarding the evidence pertaining to the DME/P&O market, failed utterly to address the district court's conclusion that B&H had not demonstrated antitrust injury, and inappropriately devoted much of its appellate briefing to introducing an entirely new theory of antitrust liability. Such conduct on appeal deserves sanction pursuant to FRAP 38.

### III. CONCLUSION

For the reasons discussed above, we **AFFIRM** the judgment of the district court and **GRANT** W&F's motion for appellate sanctions. W&F shall have fifteen days from the filing of this opinion to file an affidavit setting forth the hourly rates of their counsel and the number of hours spent in defending this appeal, and whatever documentation and argument in support thereof they deem appropriate. B&H and Ryan may then file a response to this documentation within ten days.